RECORD NOS. 22-1146, 22-1147 (consolidated)

ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

In The

United States Court of Appeals
for the District of Columbia Circuit

CITY OF QUINCY, MA, FORE RIVER RESIDENTS AGAINST THE
COMPRESSOR STATION, REBECCA HAUGH, MICHAEL H. HAYDEN,
FOOD & WATER WATCH AND TOWN OF BRAINTREE, MA,
Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION,
Respondent.

ALGONQUIN GAS TRANSMISSION, LLC AND
INTERSTATE NATURAL GAS ASSOCIATION OF AMERICA
Intervenors.

Appeal from Federal Energy Regulatory Commission
Final Decision, February 21, 2020; and
Order on Briefing and Addressing Arguments Raised on Rehearing,
January 20, 2022
Pursuant to 15 U.S.C. § 717r(b)

**OPENING BRIEF OF PETITIONERS, CITY OF QUINCY, ET AL.**

Michael H. Hayden
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA 02210-1181
Phone: (617) 439-7500
*Counsel for Petitioners,
City of Quincy, et al.*

**Final Opening Brief: March 9, 2023**

## CORPORATE DISCLOSURE STATEMENT

Fore River Residents Against the Compressor Station (FRRACS) is a not-for-profit organization founded in 2015.  FRRACS is a community-based group for residents of Weymouth, Quincy, and Braintree, Massachusetts, engaged in regulatory advocacy on behalf of its community members in connection with natural gas proposals in the Fore River Basin, including the construction and operation of the Weymouth natural gas compressor station.  FRRACS has no parent companies, and there are no publicly held corporations that have a ten-percent or greater ownership interest in FRRACS.

Food & Water Watch is a not-for-profit organization founded in 2005 to ensure access to clean drinking water, safe and sustainable food, and a habitable climate system.  Food & Water Watch has no parent companies, and there are no publicly held corporations that have a ten-percent or greater ownership interest in Food & Water Watch.

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

Pursuant to Circuit Court Rule 28(a)(1), the Petitioners state the following:

**A.     Parties and Amici:**

These consolidated cases are a direct appeal.  Accordingly, D.C. Circuit Rule 28(a)(1)(A), requiring a list of all parties, intervenors, and amici who have

i

appeared before the district court is not applicable.  The parties and intervenors participating in this Court are listed below.

Petitioners

City of Quincy, MA, Fore River Residents Against the Compressor Station, Rebecca Haugh, Michael H. Hayden and Food & Water Watch are the Petitioners in Case Number 22-1146.

City of Quincy, MA, Fore River Residents Against the Compressor Station and the Town of Braintree, MA are the Petitioners in Case Number 22-1147.

Respondent

The Federal Energy Regulatory Commission is the Respondent in Case Numbers 22-1146 and 22-1147.

Intervenors

Algonquin Gas Transmission, LLC and Maritimes & Northeast Pipeline, L.L.C. are intervenors on behalf of the Respondent in Case Number 22-1146.

Algonquin Gas Transmission, LLC, Maritimes & Northeast Pipeline, L.L.C. and Interstate Natural Gas Association of America are intervenors on behalf of the Respondent in Case Number 22-1147.

Amici

There are no amici in this matter.

**B.     Rulings Under Review:**

Case No. 22-1146

    i.    Appeal from Commission Final Decision: Commission's Order Denying

        Rehearing re Algonquin Gas Transmission, LLC under CP16-9, FERC

        Docket No. CP16-9-000, February 21, 2020, Docket No. CP16-9-000,

        158 FERC ¶61,061, Deferred Joint Appendix ("JA") Vol.I.326; and

Case No. 22-1147

    ii.    Appeal from Commission's Order on Briefing and Addressing

        Arguments Raised on Rehearing, January 20, 2022, Docket No. CP16-9-

        000, 158 FERC ¶61,061, JA Vol.III.1366.

**C.     Related Cases:**

The consolidated cases on review were transferred to this Circuit by the

United States Court of Appeals for the First Circuit, but have not otherwise

previously been before this Court or any other court, as defined in D.C. Circuit

Rule 28(a)(1)(c).   In addition to Case No. 22-1146 and 22-1147, certain other

related cases are pending before this Court, but are held in abeyance pending the

outcome of these consolidated cases.  The related cases held in abeyance before

this Court are 21-1115, 21-1138, 21-1153 and 21-1155.

                 /s/ *Michael H. Hayden*
                 Michael H. Hayden

# TABLE OF CONTENTS

**Page(s)**

CORPORATE DISCLOSURE STATEMENT……………………………………..i

CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND
RELATED CASES………………………………………………………………i

TABLE OF CONTENTS…………………………………………………………iv

TABLE OF AUTHORITIES……………………………………………....…vii

STATUTES AND REGULATIONS……………………………………….....x

GLOSSARY …………………….……………………………….……....xi

JURISDICTIONAL STATEMENT…………………………………………..1

    A.    Basis for the district court's or agency's subject-matter jurisdiction...1

    B.    Basis for the court of appeals' jurisdiction…………………………...1

    C.    The filing dates establishing the timeliness of the appeal or petition
         for review………………….…………………………………………..2

    D.    An assertion that the appeal is from a final order or judgment that
         disposes of all parties' claim…………………………………………2

STANDING………………….……………………………...……………………3

STATEMENT OF THE ISSUES…………………………………………...4

STATEMENT OF THE CASE…..…………………………………………….....5

iv

A.   The Certificate Order Required Completion of Construction of the Compressor Station Within Two Years and the Manner in Which the Approval of this Extension Request Was Granted Deviated From the Commission's Standard Practice……………......5

B.   Commision's Order Denying Rehearing Sought to Justify 34 Minute Turnaround for Letter Order Granting Algonquin's Request for Extension of Two-Year Deadline and Was Found Unacceptable In Vociferous Dissent By Commissioner Glick ……………………..11

C.   Change in Core Circumstances Allows the Commission to Continue its Public Interest Responsibility By Considering the Factors Relevant to the Authorization in Question……………………….…12

D.   The Potential Health Impacts Addressed in the Record Are Beyond the Range of Those Contemplated By the Commission in the Certificate Proceeding, Including the Environmental Assessment…..23

E.   Algonquin's Own Policies Can Protect the Environmental Justice Communities of Quincy and Braintree By Using the Alternative Types of Compressor Station Used Elsewhere in Densely Populated Communities…………………………………………..30

SUMMARY OF THE ARGUMENT…………………………...………………...33

ARGUMENT………………………………………………………………...34

I.   Commission's Letter Order Granting Algonquin's Request For Extension of Two-Year Deadline is Arbitrary, Capricious, an Abuse of Discretion, or Otherwise Not in Accordance With Law …………………….…...……..34

II.   Commission's Order Denying Rehearing is Arbitrary, Capricious, an Abuse of Discretion, or Otherwise Not in Accordance With Law………...39

III.   Commission's Order Concluding There Was Not A Sufficient Change in Core Circumstances To Provide Basis for Further Review is Arbitrary, Capricious, an Abuse of Discretion, or Otherwise Not in Accordance With Law…………………………………………………...........42

v

IV.    Commission's Order Concluding the COVID-19 Impact Upon
       Environmental Justice Communities Does Not Provide Basis for Further
       Review is Arbitrary, Capricious, an Abuse of Discretion, or Otherwise
       Not in Accordance With Law……………………………………….…...46

CONCLUSION AND RELIEF SOUGHT……………………………………..51

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT..……….....53

CERTIFICATE OF FILING AND SERVICE………………………………….…...54

ADDENDUM……………………………………………………………………..55

# TABLE OF AUTHORITIES

## CASES

Page(s)

Allentown Mack Sales & Serv., Inc. v. NLRB,
522 U.S. 359, 118 S.Ct. 818, 139 L.Ed.2d 797 (1998)…….................35, 39-40, 44

Arlington Storage Co., LLC,
155 FERC ¶61,165 (2016)...…………………………………………………10

Cities of Campbell v. FERC,
770 F.2d 1180 (D.C. Cir. 1985)…………………………………………...43

City of Oberlin v. FERC,
937 F.3d 599 (D.C. Cir. 2019)……………………………………………14

Coburn v. McHugh,
679 F.3d 924 (D.C. Cir. 2012)……………………………………………40

Constitution Pipeline Co.,
165 FERC ¶61,081 (2018)..…………………………………………………..10

Eastern Carolinas Broadcasting Co. v. FCC,
762 F.2d 95 (D.C. Cir. 1985)……………………………………………...43

Env't Def. Fund v. FERC,
2 F.4th 953 (D.C. Cir. 2021)……………………………………………47

Fox v. Clinton,
684 F.3d 67 (D.C. Cir. 2012)……………….........................................39-40, 44

Fred Meyer Stores, Inc. v. Nat'l Lab. Rels. Bd.,
865 F.3d 630 (D.C. Cir. 2017)…………………………………...............42, 45

Friends of Buckingham v. State Air Pollution Control Board,
947 F.3d 68 (4th Cir. 2020)……………………………………....27, 47-48, 50

vii

Friends of Cap. Crescent Trail v. Fed. Transit Admin.,
877 F.3d 1051 (D.C. Cir. 2017)…………………………………………..….49

Friends of the Earth v. Haaland,
583 F. Supp. 3d 113 (D.D.C. 2002), appeal dismissed in part sub nom.,
2022 WL 4293098 (D.C. Cir. Apr. 15, 2022)…………………………….........49

Greater Bos. Television Corp. v. FCC,
463 F.2d 268 (D.C. Cir. 1971)…………………………………………………..44

Marsh v. Or. Nat. Res. Council,
490 U.S. 360, 109 S. Ct. 1851 (1989)……..…………………………………49

Michigan v. E.P.A.,
576 U.S. 743, 135 S. Ct. 2699, 192 L. Ed. 2d 674 (2015)……………………40, 44

Missouri Pub. Serv. Comm'n v. F.E.R.C.,
601 F.3d 581 (D.C. Cir. 2010)………………………………………............35

Morall v. Drug Enforcement Admin.,
412 F.3d 165 (D.C. Cir. 2005)…………………………………………………..40

Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut.
Automobile Ins. Co.,
463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)……........................40

Myersville Citizens for a Rural Cmty., Inc. v. F.E.R.C.,
783 F.3d 1301 (D.C. Cir. 2015)……………….........................................33

Northwestern Public Service Co. v. Fed. Power Comm'n,
520 F.2d 454 (D.C. Cir. 1975)……………….........................................3

Oklahoma Nat. Gas Co., a Div. of ONEOK,
940 F.2d 699 (D.C. Cir. 1991)…………………………………………........43

Rockies Express Pipeline LLC,
128 FERC ¶61,045 (2009)…………………………………………………............38

SFPP, L.P. v. Fed. Energy Regul. Comm'n,
967 F.3d 788 (D.C. Cir. 2020)………………………………………………….44

Siegel v. SEC,
592 F.3d 147 (D.C. Cir. 2010)……………………………………………...39-40

Spire Missouri Inc. v. Env't Def. Fund,
142 S. Ct. 1668 (2022)………………………………………………………….45

TNA Merch. Projects, Inc. v. FERC,
857 F.3d 354 (D.C. Cir. 2017)……………………………………………..........29

Trunkline LNG Co.,
22 FERC ¶ 61,245 (1983)……………………………………………………….29

Vecinos para el Bienestar de la Comunidad Costera v. FERC,
6 F.4th 1321 (D.C. Cir. 2021)……………………………………………46, 50

Wash. Gas Light Co. v. FERC,
532 F.3d 928 (D.C. Cir. 2008)………………………………………………….14

WildEarth Guardians v. Zinke,
368 F. Supp. 3d 41 (D.D.C. 2020)……………………………………….14-15

## STATUTES, REGULATIONS AND OTHER AUTHORITIES

The following applicable statutes and regulations appear in the Addendum to

Joint Brief of Petitioners, City of Quincy, *et al.*

5 U.S.C. § 706(2)(A)…………………………………………………………...33

15 U.S.C. § 717f(c)……………………………………………………………1

15 U.S.C. § 717o……………………………………………………………....42

15 U.S.C. § 717r(a)…………………………………………………………..2, 11

15 U.S.C. § 717r(b)…………………………………………………………..1-4, 50

42 U.S.C. § 4332(2)(C)(v)…………………………………………………...15

18 C.F.R. § 375.301……………………………………………………….........36

18 C.F.R. § 375.308…………………………………………………………...36-38

18 C.F.R. § 385.716……………………………………………………………...42-43

40 C.F.R. § 1502.9(c)………………………………………………………..49

49 C.F.R. § 192.163 …………………………………………………………17, 20

Chapter 8 of the Acts of 2021, An Act Creating a Next-Generation Roadmap
for Massachusetts Climate Policy…………………………………24, 25, 27, 49-50

Federal Energy Regulatory Commission Updated Policy Statement on
Certification of New Interstate Natural Gas Facilities………………...28, 29, 48-50

x

# GLOSSARY

| | |
|---|---|
| A.G. Report | Massachusetts Office of the Attorney General Report entitled COVID-19's Unequal Effects in Massachusetts (May 12, 2020) |
| Algonquin | Algonquin Gas Transmission, LLC |
| Certificate Order | Order Issuing Certificate and Authorizing Abandonment, 158 FERC ¶61,061 (January 25, 2017) |
| CHBI | Clean Harbors Braintree Hazardous Waste Incinerator |
| Commission | Federal Energy Regulatory Commission |
| EA | Environmental Assessment |
| EJ | Environmental Justice |
| FERC | Federal Energy Regulatory Commission |
| FRRACS | Fore River Residents Against Compressor Station |
| MWRA | Massachusetts Water Resources Authority |
| NEPA | National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* (1969) |
| OEP | Office of Energy Projects (FERC Office) |
| PHMSA | Pipeline and Hazardous Materials Safety Administration |
| The Board | Virginia State Air Pollution Control Board |

# JURISDICTIONAL STATEMENT

A.    <u>Basis for the district court's or agency's subject-matter jurisdiction</u>

Construction of interstate natural gas facilities is regulated by the Federal

Energy Regulatory Commission ("FERC" or "Commission") as set forth under the

Natural Gas Act ("NGA"), 15 U.S.C. § 717f(c)(1)(A), which states, in pertinent

part:

> No natural-gas company or person which will be a natural-gas company
> upon completion of any proposed construction or extension shall engage in
> the transportation or sale of natural gas, subject to the jurisdiction of the
> Commission, or undertake the construction or extension of any facilities
> therefor, or acquire or operate any such facilities or extensions thereof,
> unless there is in force with respect to such natural-gas company a certificate
> of public convenience and necessity issued by the Commission authorizing
> such acts or operations. . .

15 U.S.C. § 717f(c)(1)(A).

B.    <u>Basis for the court of appeals' jurisdiction</u>

Judicial review under the NGA is governed by 15 U.S.C. § 717r(b), which

states:

> Any party to a proceeding under this chapter aggrieved by an order issued by
> the Commission in such proceeding may obtain a review of such order in the
> court of appeals of the United States for any circuit wherein the natural-gas
> company to which the order relates is located or has its principal place of
> business, or in the United States Court of Appeals for the District of
> Columbia, by filing in such court, within sixty days after the order of the
> Commission upon the application for rehearing, a written petition praying
> that the order of the Commission be modified or set aside in whole or in
> part.

15 U.S.C. § 717r(b).

C.    <u>The filing dates establishing the timeliness of the appeal or petition for review</u>

Pursuant to 15 U.S.C. § 717r, the Petitioners' Petition for Review was timely filed on April 21, 2020, within 60 days of the Commission's Order Denying Rehearing re Algonquin Gas Transmission, LLC under CP16-9, FERC Docket No. CP16-9-000 ("Order Denying Rehearing"), 170 FERC ¶61,144 (February 21, 2020) (Commissioner Glick *dissenting* with a separate statement attached).

Pursuant to 15 U.S.C. § 717r, the Petitioners' Petition for Review was timely filed on March 21, 2022, within 60 days of the Commission's Order on Briefing and Addressing Arguments Raised on Rehearing ("Order on Briefing") issued by the Commission on January 20, 2022, FERC Docket No. CP16-9-011 and -012, 178 FERC ¶61,029.

D.    <u>An assertion that the appeal is from a final order or judgment that disposes of all parties' claims</u>

The instant appeal is from two final orders that dispose of all parties' claims. This court has jurisdiction to review the Order Denying Rehearing issued on February 21, 2020 and Order on Briefing issued January 20, 2022, respectively, pursuant to 15 U.S.C. § 717r(b).

2

## STANDING

"Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the. . . United States Court of Appeals for the District of Columbia. . ."  15 U.S.C. § 717r(b).

> Under section 19(b) of the Act, 15 U.S.C. s 717r(b) (1970), for [a party] to have standing to obtain review of an [] order it must be "aggrieved" by such order.  Whether a party is aggrieved within the meaning of section 19(b) and similar statutes is not controlled by any general rule but must be determined on the basis of the specific facts in each case. . . we conclude that a party is aggrieved within the meaning of section 19(b) of the Natural Gas Act if as a result of an order [] it has sustained "injury in fact" to an interest "arguably within the zone of interests to be protected or regulated" [] under the Act.

Northwestern Public Service Co. v. Fed. Power Comm'n, 520 F.2d 454, 457–58 (D.C. Cir. 1975).

The City of Quincy, MA, Food & Water Watch, Fore River Residents Against the Compressor Station, Michael H. Hayden, Rebecca Haugh and the Town of Braintree, MA (collectively, "Petitioners"), are Intervenors in the FERC proceeding.  The Certificate Order listed those parties who filed timely, unopposed motions to intervene [Petitioners' Motions to Intervene, JA Vol.I.6-26], which were granted by operation of Rule 214 of the Commission's Rules of Practice and Procedure.  (Certificate Order, at 4-5, JA Vol.I.56-57).  The Petitioners are all listed as Intervenors whose unopposed motions to intervene were granted by the Commission.  (Certificate Order, Appendix A, at 91, JA Vol.I.91).

3

Construction and operation of a natural gas compressor station powered by a natural gas fired combustion turbine will cause "injury in fact" to the Petitioners that is "arguably within the zone of interests to be protected or regulated" under the Natural Gas Act.  The Petitioners are aggrieved by the Order Denying Rehearing issued February 21, 2020 and Order on Briefing issued January 20, 2022 and are "within the zone of interests to be protected or regulated," thus, pursuant to 15 U.S.C. § 717r(b), the Petitioners have standing to pursue judicial review.

## STATEMENT OF THE ISSUES

I.    Whether the Commission's Letter Order granting Algonquin Gas Transmission, LLC's 12/26/18 request for Extension of Time to Complete Project under CP16-9 issued by FERC's Office of Energy Projects, Division of Pipeline Certificates, Chief, Certificate Branch 1, issued December 26, 2018 is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law?

II.    Whether the Commission's Order Denying Rehearing re Algonquin Gas Transmission, LLC under CP16-9, issued February 21, 2020, is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law?

III.    Whether the Commission's Order on Briefing issued January 20, 2022 is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law?

## STATEMENT OF THE CASE

A. <u>The Certificate Order Required Completion of Construction of the Compressor Station Within Two Years and the Manner in Which the Approval of this Extension Request Was Granted Deviated From the Commission's Standard Practice</u>

In 2015, Algonquin Gas Transmission, LLC ("Algonquin") proposed the construction and operation of a new natural gas transmission compressor station ("the Station") at 50 Bridge Street in Weymouth, Massachusetts.  On January 25, 2017, the Commission issued an Order Issuing Certificate and Authorizing Abandonment re Algonquin Gas Transmission, LLC et al., under CP16-9 ("the Certificate Order"), approving, *inter alia*, the construction and operation of the Station, subject to certain conditions.   (Certificate Order,  JA Vol.I.53).  The Certificate Order expressly required completion of construction of the Station within two years as follows:

> **The Commission orders:**
> (A) A certificate of public convenience and necessity is issued authorizing Algonquin and Maritimes to construct and operate the Atlantic Bridge Project, as described in this order and in their application.
> (B) The certificate authority issued in Ordering Paragraph (A) shall be conditioned on the following:
> (1) Algonquin and Maritimes' **completion of construction of the authorized facilities and making them available within two years from the date of this order**, pursuant to section 157.20(b) of the Commission's regulations;

(Certificate Order, p. 89,  JA Vol.I.141) (emphasis added).

5

The selection of a two-year deadline to complete construction was

meaningful, as the Commission's Order Denying Rehearing explained:

> The Commission's certificate orders include completion deadlines, in part, because the information supporting our public convenience and necessity determinations can go stale with the passage of time. But that is not the case here as explained below. The purpose of establishing a deadline for the completion of construction is to "diminish[] the potential that the public interest might be compromised by significant changes occurring between issuance of the certificate and commencement of the project." However, construction deadlines may be extended for good cause. The completion date specified in a certificate order provides what the Commission believes—based on its assessment of circumstances relevant to the specific project—to be a reasonable period of time for the project sponsor to complete construction and make the project available for service. However, if a certificate holder files for an extension of time within a timeframe during which the environmental and other public interest findings underlying the Commission's authorization can be expected to remain valid (as is the case here), the Commission, or staff exercising delegated authority, generally will grant an extension of time if the movant demonstrates good cause.

(Order Denying Rehearing, ¶ 15, JA Vol.I.333-334) (footnotes omitted).

Given the importance of the two-year deadline to complete construction,

Congressman Stephen Lynch wrote to FERC on January 3, 2018, stating, in

pertinent part, "I respectfully request that you deny any application by Spectra

Energy for an extension of the timeline to begin work on the compressor."

(Congressman Stephen F. Lynch submits comments re the compressor station

proposed by Spectra Energy etc. under CP16-9, dated January 3, 2018, filed

February 22, 2018, JA Vol.I.163). Critically, FERC Chairman, Kevin J. McIntyre,

responded to Congressmen Lynch, on March 21, 2018, stating, in pertinent part,

"Algonquin has not to date made any requests for an extension of time, so there is no matter pending before the Commission for consideration." [Response to Congressman Stephen F. Lynch 1/03/18 letter re the Algonquin Gas Transmission LLC's (Algonquin) Atlantic Bridge Project under CP16-9, JA Vol.I.165]. Implicit in Chairman McIntyre's response to Congressman Lynch was that if, and when, Algonquin made a request for an extension of time, the Commission would give such request its due consideration and allow for Congressman Lynch, and the public, to comment.

Algonquin's Request for Certificate Extension filed by Chris Harvey, Manager, Rates and Certificates for Algonquin Gas Transmission, LLC, sought an extension of the two-year deadline to complete construction and was distributed to FERC's distribution list at 11:17 a.m. on December 26, 2018. (JA Vol.I.178). The Commission's letter order granting Algonquin an extension of two-year deadline to complete construction was distributed to FERC's distribution list at 11:51 a.m. on December 26, 2018, only 34 minutes after Algonquin's Request for Certificate Extension was distributed to FERC's distribution list at 11:17 a.m. (JA Vol.I.175).

Appendix B of the Certificate Order (Environmental Conditions for Algonquin and Maritimes Atlantic Bridge Project) sets forth the delegated authority of the Director of FERC's Office of Energy Projects ("OEP"). (Certificate Order, 93-100, JA Vol.I.145-152). The only delegation of authority by

7

FERC set forth in the Certificate Order pertains solely to the Director of OEP, as

follows:

> The Director of OEP has delegated authority to take whatever steps are
> necessary to ensure the protection of all environmental resources during
> construction and operation of the Project. This authority shall allow:
>
> a.    the modification of conditions of this Order; and
>
> b.    the design and implementation of any additional measures deemed
>       necessary (including stop-work authority) to ensure continued
>       compliance with the intent of the environmental conditions as well as
>       the avoidance or mitigation of adverse environmental impact resulting
>       from construction and operation of the Project.

(Certificate Order, Appendix B, ¶ 2, at 93, JA Vol.I.145).  FERC's OEP

organizational chart (updated June 4, 2018) lists the Office of the Director of OEP

as consisting of a Director, Deputy Director and Sr. Policy Advisor.  (JA Vol.IV.

1402).  Below the Office of the Director of OEP on the organizational chart is the

Division of Pipeline Certificates, which consists of an Acting Director and Deputy

Director.  Below the Division of Pipeline Certificates on the organizational chart

are two Certificates Branch Chiefs, including Certificates Branch 1 Chief.  (JA

Vol.IV.1402).  Nowhere in the Certificate Order is subdelegation by the Director

of OEP to Chief, Certificate Branch 1, OEP Division of Pipeline Certificates,

expressly authorized.  (Certificate Order at 93-100, JA Vol.I.145-152).

    Appendix B of the Certificate Order (Environmental Conditions for

Algonquin and Maritimes Atlantic Bridge Project) also sets forth the delegated

authority of the Director of OEP concerning, *inter alia*, written authorization from the Director of OEP to commence construction of any Project facilities.

(Certificate Order, at 93-100, JA Vol.I.145-152).  Appendix B of the Certificate Order includes examples of where the Director of OEP's written authorization is required, including the following:

> Within 60 days of the acceptance of this Certificate and before construction begins, the Applicants shall file an Implementation Plan for the Project for review and written approval by the Director of OEP.

(Certificate Order, Appendix B, ¶ 6, at 95-96, JA Vol.I.147-148).

> Prior to receiving written authorization from the Director of OEP to commence construction of any Project facilities, the Applicants shall file with the Secretary documentation that it has received all applicable authorizations required under federal law (or evidence of waiver thereof).

(Certificate Order, Appendix B, ¶ 9, at 97, JA Vol.I.149).

> The Applicants must receive written authorization from the Director of OEP before commencing service on each discrete facility of the Project. Such authorization will only be granted following a determination that rehabilitation and restoration of the right-of-way and other areas affected by the Project are proceeding satisfactorily.

(Certificate Order, Appendix B, ¶ 10, JA Vol.I.149).

> . . .The Director of OEP must review and approve this plan in writing before construction of the alternative crossing.

(Certificate Order, Appendix B, ¶ 13, at 97-98, JA Vol.I.150).

> Prior to construction, Algonquin shall file with the Secretary, for the review and written approval of the Director of OEP, a revised set of Residential Construction Plans that incorporate and address the comments Algonquin received from affected landowners.

(Certificate Order, Appendix B, ¶ 15, at 98, JA Vol.I.150).

> Prior to construction during nighttime hours (10:00 p.m. to 7:00 a.m.) between mileposts 0.5 and 0.7 along the Southeast Discharge Take-up and Relay, Algonquin shall file with the Secretary for review and written approval by the Director of OEP, a nighttime construction noise analysis and mitigation plan for all NSAs within one half mile of the construction work areas where nighttime construction is requested.

(Certificate Order, Appendix B, ¶ 19, at 99, JA Vol.I.151). Nowhere in the Certificate Order is subdelegation by the Director of OEP to OEP Chief Certificate Branch 1 expressly authorized. (Order at 93-100, JA Vol.I.145-152).

The Commission's Order Denying Rehearing disclosed that the Commission deviated from its standard practice because the OEP Director's designee acted in a *contested* action before the extension request was protested (*i.e.*, within 34 minutes on the day after Christmas), stating in pertinent part:

> Further, while not required, as a matter of practice the Commission itself generally acts on requests for extensions of time to complete construction for NGA facilities when such requests are contested before order issuance.**109**

> **FN 109** *See, e.g., Constitution Pipeline Co.,* 165 FERC ¶ 61,081; *Arlington Storage Co., LLC,* 155 FERC ¶ 61,165. The dissent states that "[w]hether to modify a significant deadline in a section 7 certificate is an important issue that should be resolved by the Commission acting as a whole, not Commission staff acting through its delegated authority." We agree that the Commission as a whole should act on contested extensions of time to complete construction. Indeed, the Commission generally does. In this case, the OEP Director's designee acted before the extension request was protested. As discussed above, we find the designee's action was permissible under the Commission's regulations and proper as Algonquin demonstrated good cause. Nevertheless, to ensure the Commission as a whole may act on contested extensions of time for NGA facilities, we

10

announce in this case a process by which the Commission will notice extensions of time for NGA facilities for comment and intervention.

(Order Denying Rehearing, ¶39, n109, JA Vol.I.343).

> B.  <u>Commision's Order Denying Rehearing Sought to Justify 34 Minute Turnaround for Letter Order Granting Algonquin's Request for Extension of Two-Year Deadline and Was Found Unacceptable In Vociferous Dissent By Commissioner Glick</u>

As required by 15 U.S.C. § 717r(a), the Petitioners filed a timely Request for Rehearing of Approval For Extension of Time to Complete Project on January 25, 2019. Following a Stay issued by the Commission, the Commission's Order Denying Rehearing included a nine-paragraph dissent from Commissioner Glick. This dissent (footnotes omitted) stated in pertinent part:

> GLICK, Commissioner, *dissenting*:
>
> 1. On December 26, 2018, the Commission's staff extended by two years the deadline to complete construction of the Atlantic Bridge pipeline just hours after the project's developer—Algonquin Gas Transmission, LLC (Algonquin)—asked for the additional time. I dissent from today's order denying rehearing of Commission staff's action because, in my opinion, such a significant modification of a condition in a natural gas pipeline certificate requires consideration and action by the Commission as a whole, not Commission staff on its own. This proceeding presents important issues and the parties deserve better than a cursory response from Commission Staff.
>
> ***
>
> 3. Whether to modify a significant deadline imposed by a section 7 certificate is an important issue that should be resolved by the Commission acting as a whole, not Commission staff acting through its delegated authority. For one thing, a deadline to complete construction helps to limit the disruption caused by constructing a new pipeline by ensuring that any

11

disruption occurs within a discrete timeframe and that construction is not prolonged for years into the future. In addition, a deadline to complete construction helps to ensure that the Commission does not award certificates to speculative projects or projects that cannot or will not be timely completed. Finally, as today's order explains, a deadline for completing construction "diminish[es] the potential that the public interest might be compromised by significant changes occurring between issuance of the certificate and commencement of the project." In short, deadlines to complete construction are an important tool for the Commission to use in ensuring that an interstate natural gas pipeline is developed in a manner that is consistent with the public interest.

***

6. Although my concerns would apply to any exercise of delegated authority under these circumstances, I am particularly troubled by the facts before us here. As explained above, the extension request was approved the same morning it came in and only minutes after it was published on the docket. That means that the parties who opposed the extension had no opportunity whatsoever to be heard before it was granted. Moreover, I do not see how, on the record before us, a few hours was anywhere near enough time to meaningfully evaluate whether good cause existed to extend the deadline, much less to render the type of reasoned decision that the Administrative Procedure Act requires.

7. Actions like these only lend further credence to those who view the Commission as a rubber stamp in pipeline proceedings. We can and must do better. The process of producing an order that is voted on by the full Commission may not be perfect—and the Commissioners may not always agree—but that process will almost certainly deliver more reasoned and considered decisionmaking than the parties received here.

[Order Denying Rehearing, Com. Glick, *dissenting* at 1-4] (JA Vol.I.346-349).

C.    Change in Core Circumstances Allows the Commission to Continue its Public Interest Responsibility By Considering the Factors Relevant to the Authorization in Question

In response to two unplanned emergency shutdowns at the Station on

September 11, 2020 and September 30, 2020, the Pipeline and Hazardous Material

Safety Administration ("PHMSA") issued a Corrective Action Order for the

Station on October 1, 2020, which stated, in pertinent part:

> After evaluating the foregoing preliminary findings of fact, and having considered that the Station had an O-ring gasket failure that triggered the manual operation of its emergency shutdown system and an unplanned emergency shutdown for unknown reasons within the past three weeks; the uncertainties as to the cause of Incident 2; and the Station's location in a High Consequence Area, and proximity to populated areas and highly-trafficked public roads, I find that continued operation of the Station without corrective measures is or would be hazardous to life, property, or the environment, and that failure to issue this Order expeditiously would result in the likelihood of serious harm.

(PHMSA Corrective Action Order, October 1, 2020, at 3, JA Vol.II.694). The two

Root Cause Failure Analyses completed in response to the PHMSA Corrective

Action Order raise as many questions as answers and indicate troubling

conclusions that recommend further refinement of the construction and operation

protocols for the Station. (Root Cause Failure Analyses, at 2, JA Vol.II.702).

On April 6, 2021, the Station experienced a third unplanned emergency gas

release within a seven month span. (JA Vol.III.1029).

In light of the three unplanned emergency shutdowns, the resulting PHMSA

Corrective Action Order and Root Cause Failure Analyses, this change in core

circumstances required FERC to reexamine project need, project safety, and

Environmental Justice ("EJ") concerns raised by the operation of the Station during

the COVID-19 pandemic. The issuance of the Certificate Order on January 25,

2017 could not possibly have foreseen the impact of COVID-19, nor could the

13

Certificate Order have anticipated the disparate impact the pandemic would have upon EJ communities in the Commonwealth of Massachusetts. Now, nearly six years after the original Certificate Order was issued (in January 2017), the new developments resulting from the COVID-19 pandemic, the three unplanned emergency shutdowns and the change in project need require FERC to reopen the record to examine the change in core circumstances before allowing the Station to continue operating.

Safety was not considered in the granting of the Certificate Order in January 2017, nor was it considered in the granting of the in-service permission to Algonquin to operate the Station in September of 2020. This Court has recognized that the Commission's duties under NEPA require it to not only "look hard at the environmental effects of [its] decision," but also "a project's impact on public safety." City of Oberlin v. FERC, 937 F.3d 599, 602 (D.C. Cir. 2019) (internal citations omitted). As such, the Commission must meaningfully consider the public safety issues associated with permitting gas infrastructure as it must be a component of a public interest consideration. See Wash. Gas Light Co. v. FERC, 532 F.3d 928, 932-33 (D.C. Cir. 2008) (finding project not consistent with public convenience where Commission failed to ensure that project could operate safely). Moreover, a minor mention does not meet the "hard look" standard; it requires the Commission "assess the reasonably foreseeable impacts of a proposed action

14

before an irretrievable commitment of resources is made that would trigger those impacts." WildEarth Guardians v. Zinke, 368 F. Supp. 3d 41, 64 (D.D.C. 2020), *citing* 42 U.S.C. § 4332(2)(C)(v).

This is of particular significance because there is no possible evacuation route for the three affected communities despite the Station's multiple operational failures. As the Station sits on a peninsula abutting a major evacuation route (Bridge Street, Route 3A, Weymouth, MA) and is less than 725 feet from the ramps of the Fore River Bridge with only one egress from the location of the Station, should an accident or explosion occur on the Station site, including any accident at the Algonquin metering and regulating station that abuts the bridge or along the attached pipelines running under the bridge adjacent to the bridge abutments, potential damage to the bridge and roadways would close the bridge and prevent escape from North Weymouth, Quincy, and East Braintree. As these communities are connected by a labyrinth of small streets, Route 3A, and Route 53, a backup in one section causes a backup in all other sections of this maze.

In a 1990 report from the Massachusetts Executive Office of Human Services during the siting study of the Clean Harbors Braintree Hazardous Waste Incinerator ("CHBI"), the report notes that evacuation of vulnerable populations surrounding the East Braintree location would not be possible should there be an emergency. (JA Vol.II.658). The roadways considered have not changed, nor have

15

they been expanded since 1990, although the traffic has become considerably worse. (JA Vol.II.658). The senior housing reported in the study still exists in Braintree, but residences in Quincy (1000 Southern Artery), Quincy Point (Pagano Towers), and Germantown-Quincy (O'Brien Towers) would not have been included in this report. (Note: Quincy Hospital is closed). The CHBI was to be situated within the one-mile radius of the Station and, therefore, the 1990 evacuation study is pertinent to this case as traffic patterns and evacuation routes would be the same. (JA Vol.II.658).

The Town of Weymouth has produced its own safety and evacuation plan. (JA Vol.II.658). However, it is limited in scope and is not a regional plan. The plan map indicates the evacuation routes. Only Route 3A (Bridge Street) is a four-lane roadway. All other roadways are two-lane, two-way residential streets. The population of North Weymouth that would need to be evacuated in the event of an incident within the area of this map is 8,190 with 3511 housing units. (JA Vol.II. 659). The Massachusetts Emergency Management Agency has yet to develop a regional plan for Weymouth, Quincy and Braintree.

The proximity to the Fore River Bridge and the Massachusetts Water Resources Authority ("MWRA") Sewage Pumping Station risks loss of life and loss of critical infrastructure in the event of a fire or explosion at the Station site, the metering and regulating station, or the concurrent pipelines. According to a

16

Global Asset Protection LLC risk management guidelines report for gas

compressor stations:

> *Plant Layout and Separation*
>
> *Spatial separation is the most effective loss control method. Design
> separation into a plant during its very early planning stages. Key spacing
> recommendations are:*
> • *Locate the main gas transmission line at least 350 ft (110 m) from the gas
> compressor building.*
> • *Locate all other buildings and structures at least 350 ft (110 m) from the
> main gas transmission line and from the gas compressor building.*

https://axaxl.com/~/-/media/axaxl/files/pdfs/prc-guidelines/prc-
17/prc1732gascompressorstationsv1.pdf?sc_lang=en&hash=9650170C73F6BE8E
43B079A097E6263F (JA Vol.II.659).

The Station's auxiliary buildings directly abut the main compressor building.

The Station's main compressor building is approximately 256 feet from the

MRWA station.  (JA Vol.II.659).  Between the main compressor building and the

MWRA are the blowdown stacks and the oil cooler.  The blowdown stacks are

beside the intake ventilation for the sewage pumping station.  (JA Vol.II.659-660).

Code of Federal Regulations, 49 C.F.R. § 192.163 - Compressor Stations:

Design and Construction, states, "each main compressor building of a compressor

station must be located on property under the control of the operator.  It must be far

enough away from adjacent property, not under control of the operator, to

minimize the possibility of fire being communicated to the compressor building

from structures on adjacent property."  The term "far enough away" is not defined

by the regulation, but taking into consideration the GAP standard, the Station is not far enough away from the MWRA (at only 256 feet) to avoid transmission of a hazardous situation such as a fire.  Any fire or explosion at the Station would structurally affect the MWRA sewage pumping station and could damage the sensitive computer systems that control the daily flow of sixty million gallons of sewage passing through the system to the Deer Island treatment facility.  Damage to this infrastructure would cause raw sewage to be dumped into Quincy Bay, thereby causing irreparable damage to the communities of Quincy, Braintree and Weymouth.

The Pipeline and Hazardous Materials Safety Administration released a report detailing methods and tools for pipeline risk modeling ["Pipeline Risk Modeling: Overview of Methods and Tools for Improved Implementation. U.S. Department of Transportation, PHMSA, February 1, 2020.] https://www.phmsa.dot.gov/sites/phmsa.dot.gov/files/2020-03/Pipeline-Risk-Modeling-Technical-Information-Document-02-01-2020-Final.pdf  (JA Vol.II. 661-662).  PHMSA defined risk as the product of likelihood and consequence. PHMSA further described the consequences resulting from pipeline failure as a function of the pipeline product hazard, release rate, dispersion characteristics, impacted receptors, and loss by impacts on those receptors (with receptors defined as "Who or what could be impacted by the release given the product hazard,

volume, and dispersion") [Pipeline Risk Modeling, Section V, "Consequence Modeling"].  (JA Vol.II.662).

The prior safety assessment reported by Algonquin only disclosed the evaluation of a single consequence, for the impacts of an incident on the structural integrity of the bridge.  Consequences for human receptors that might be immediately outside the Station fence line in the public park, in the adjacent public parking lot, walking on the bridge, using the adjacent recreational waterways (e.g., for fishing or kayaking), or within cars on the busy adjacent highway were conspicuously omitted from the original safety report that was used for the Commission's original project evaluation. Previous analyses of gas releases at the site showed that gas releases at the Station, such as the three unplanned emergency shutdowns that occurred over the course of seven months during the Station's commissioning, could cross the Route 3A and Fore River Bridge at flammable concentrations under specific weather conditions.  (JA Vol.II.662-663).  The consequence of flammable gas concentrations on the highway and bridge are substantial, as the passing cars would pose an ignition source and there is a high likelihood that persons would suffer injury or death from thermal effects of combustion.

The Environmental Assessment ("EA") for the Atlantic Bridge Project includes a Section entitled Safety Standards, which states, in pertinent part:

19

. . . **If the Commission becomes aware of an existing or potential safety problem, there is a provision in the Memorandum to promptly alert PHMSA**. . .

**FERC also participates as a member of PHMSA's Technical Pipeline Safety Standards Committee, which determines if proposed safety regulations are reasonable, feasible, and practicable**. The pipeline and aboveground facilities associated with the Project would be designed, constructed, operated, and maintained in accordance with or to exceed PHMSA's Minimum Federal Safety Standards in 49 CFR 192. **The regulations are intended to ensure adequate protection for the public and to prevent natural gas facility accidents and failures.** [emphasis added]

(EA, Section 2.9.1 Safety Standards, at 2-113).

The three unplanned emergency shutdowns of the Station require the Commission to utilize the authority described above to ensure the Station that it has granted permission to operate includes adequate protection for the public and adequate measures to prevent natural gas facility accidents and failures.

Inarguably, there are insufficient measures to prevent natural gas facility accidents and failures at the Station because three unplanned emergency shutdowns have already occurred. Thankfully, no injuries have occurred, yet. Troublingly, the Root Cause Analyses of two unplanned emergency shutdowns appear to suggest that the causes of these unrelated failures could not have been anticipated by Algonquin, therefore rendering the construction and operation of the Station insufficient to prevent such natural gas facility accidents and failures. If Algonquin cannot prevent these and future natural gas facility accidents and

20

failures, there is insufficient protection for the public and insufficient measures to prevent accidents and failures at the Station.  To be clear, natural gas facility accidents and failures may happen regularly in the field, without much notice or attention.  Given that 99% of natural gas fired combustion turbine compressor stations are located in remote areas outside the presence of large civilian populations, such remote location ensures that most natural gas facility accidents and failures do not threaten the public health.  Here, however, Algonquin chose to construct and operate the Station in an extremely densely populated urban location, within one mile of multiple EJ communities.  That risk undertaken by Algonquin in voluntarily selecting a dangerous urban locale for the Station should in no way, shape or form diminish its obligation, or the Commission's obligation to protect the public health and ensure adequate measures to prevent natural gas facility accidents and failures.  The Station now has a thrice established track record of unsafe operation. As such, operation must cease until the public, including multiple EJ communities, is *guaranteed* safety.

The EA for the Atlantic Bridge Project includes a Section entitled Impacts on Public Safety, which states, in pertinent part:

> Algonquin evaluated the likelihood of these specific incidents occurring at the Weymouth and the safety consequence of each incident scenario. Plausible incidents resulting in the release of natural gas from the compressor station site were classified by release location, volume of product release, resulting consequence, and the specific risks to the bridge structure as a result of either thermal radiation or overpressure. . .Based on

21

> this and the scenarios considered, we conclude that if a major event were to occur at the proposed Weymouth Compressor Station, it is unlikely that it would pose a threat to the structural integrity of the new Fore River Bridge or the other nearby infrastructure.

EA, Section 2.9.3 Impacts on Public Safety, at 2-121. (JA Vol.I.49).

This now outdated section of the EA must be updated to account for and examine the three unplanned emergency shutdowns at the Station in order to ensure that natural gas facility accidents and failures do not threaten the public health. Where Algonquin chose to construct and operate the Station adjacent to multiple EJ communities, the EA's conclusion that the risk and probability of natural gas facility accidents and failures do not threaten the public health must now be reevaluated. The Commission's Order on Briefing recognized the Commission's ongoing obligation:

> 16. Under section 7 of the NGA, the Commission must ensure that authorized facilities are consistent with the public interest. The Commission has "the power to attach to the issuance of a certificate and to the exercise of the rights granted . . . such reasonable terms and conditions as the public convenience and necessity may require." But the Commission's public interest responsibility under the NGA does not end once it issues a certificate of public convenience and necessity. After the Commission issues a certificate, the Commission's Director of the Office of Energy Projects has delegated authority to separately authorize the certificate-holder to (1) commence construction and (2) commence operation of the project. At each step, the Commission (or the delegated officer) may satisfy the Commission's continuing public interest responsibility by considering the factors relevant to the authorization in question. . .
> ***
> 18. The Commission nevertheless recognizes the very serious concerns raised by Petitioners and others regarding the operation of the project facilities in their community and in proximity to their homes and businesses.

Although blowdowns can be part of routine pipeline operations, two unplanned blowdowns in the span of three weeks is concerning. While the Commission in the Certificate proceeding considered the possibility of blowdowns occurring at the station, unplanned blowdowns, particularly those releasing significant volumes of natural gas, naturally raise health and safety concerns for those that live in the local communities. The blowdowns also drew into question whether construction and operation of the Weymouth compressor station complied with PHMSA standards, which is a requirement of the Commission's own regulations and a condition for the compressor's continued operation. PHMSA is responsible for ensuring compliance with its regulations. But that does not relieve the Commission from its own responsibility, consistent with its duty to the public interest, to assure compliance with the certificate and its regulations governing certificates. Upon a careful review of the record in this proceeding and consideration of the actions PHMSA has taken to ensure Algonquin's compliance with PHMSA requirements, we conclude there is no reasonable basis for staying or modifying the Authorization Order.

(Commission's Order on Briefing, at ¶¶ 16, 18) (footnotes omitted) (JA Vol.III.

1376-1378).

> D.     The Potential Health Impacts Addressed in the Record Are Beyond
>         the Range of Those Contemplated By the Commission in the
>         Certificate Proceeding, Including the Environmental Assessment

On May 12, 2020, the Massachusetts Office of the Attorney General

published a report entitled COVID-19's Unequal Effects in Massachusetts ("the

A.G. Report", JA Vol.II.847). The A.G. Report notes that communities with

greater populations of residents have the highest rates of COVID-19 infection

across 38 of the largest cities in Massachusetts, including Chelsea, Brockton,

Everett, Lawrence, and Lynn. (A.G. Report, at 3, JA Vol.II.849). The A.G.

Report notes several important reasons why this must change, and change now:

. . .With respect to the environmental factors that are exacerbating COVID-19 in the Commonwealth, even when everyone is playing by the rules, the system permits the concentration of polluting industries and facilities in our most vulnerable communities, regulatory programs do not consistently address risks to community health, environmental justice guidelines inform but do not drive decision-making, and siting and other public processes quickly become adversarial, suffer from uneven community engagement, and tend to favor parties with greater legal and technical resources and experience with regulatory bodies.

This must change. And our efforts to remedy environmental injustice must begin now, as we are all facing another threat, even greater than COVID-19—climate disruption.

(A.G. Report, at 3, JA Vol.II.849).

With the construction of the Station completed, multiple EJ communities located within one mile of the Station have already witnessed three Volatile Organic Compound releases at ground level with absolutely no notice.  These same Environmental Justice communities will now be subjected to the emissions of the Station while dealing with heightened vulnerability to the viral respiratory pandemic detailed in the A.G. Report.  (See A.G. Report at 2-9, JA Vol.II.848-55).

Here, the EA failed to sufficiently examine EJ impacts, a deficiency which is underscored by the Massachusetts Department of Environmental Protection's similar failure to conduct any substantive review of the Station's compliance with the Commonwealth's Environmental Justice Policy, which has now been heightened by passage of the new Massachusetts climate law.  On March 26, 2021, Massachusetts Governor Baker signed into law, An Act Creating a Next-

24

Generation Roadmap for Massachusetts Climate Policy (Chapter 8 of the Acts of 2021), which includes heightened EJ requirements for the Executive Office of Energy and Environmental Affairs and defines "environmental justice principles" to include "the equitable distribution of energy and environmental benefits and environmental burdens." (Id. at 37-38, JA Vol.II.897-898). Chapter 8, Acts, 2021 further states, "[t]he secretary shall consider environmental justice principles. . .to reduce the potential for unfair or inequitable effects upon an environmental justice population." (Id. at 41, JA Vol.II.901).

The Commission's EA did not consider the equitable distribution of energy and environmental benefits and environmental burdens to the multiple EJ communities near the Station. Neither did the EA consider Environmental Justice principles to reduce the potential for unfair or inequitable effects upon the multiple EJ communities near the Station. Instead, the EA stated:

**Environmental Justice**

As discussed in section 2.5.7 the primary issues associated with Environmental Justice Communities for the Project are air quality, noise, and visual impacts. For more detailed information specific to cumulative impacts associated with these resource topics refer to the appropriate subsection within this cumulative impact discussion. As noted in these sections, visual resource impacts would be minimal and cumulative air quality and noise impacts (including existing infrastructure and the [Access Northeast] Project) would be below established thresholds to protect human health and welfare. Therefore, there is no significant cumulative impact on Environmental Justice Communities.

Overall, the Atlantic Bridge Project would have short-term, but positive effects on the economy in the Project area, such as increased employment thus lowering local unemployment rates and increased sales and tax revenues. Other major projects in the area would likely have similar impacts on the economy. Thus, short-term cumulative effects on socioeconomics in the Project area are possible.

[EA, 2.10.6 Socioeconomics (Environmental Justice), at 2-138] (JA Vol.I.50). The EA did not include any analysis of the benefit that the Station will have on the EJ communities near the Station. That cumulative air quality and noise impacts would be below established thresholds to protect human health and welfare (a contested conclusion) is not a *benefit* to the multiple EJ communities near the Station. To the extent the EA intended to suggest that the Atlantic Bridge Project would have short-term, but positive effects on the economy in the Project areas of the several EJ communities near the Station, such as increased employment thus lowering local unemployment rates and increased sales and tax revenues, such conclusions are completely unfounded. Quincy Point and Germantown, for example, are located in the City of Quincy, not Weymouth, so there can be no conceivable increased sales and tax revenues for these EJ Communities, nor for EJ communities in Braintree. If there is any evidence that the Station has increased employment for the multiple EJ communities near the Station, Petitioners would welcome that data, but safely assume that it does not exist. The crowning cap on the inequity of siting the Station is the fact that the local utility, National Grid, does not require the Station to provide natural gas service the local communities of

26

Weymouth, Braintree, and Quincy, and although the Massachusetts Attorney General's Office opposed charging those ratepayers for the infrastructure expense associated with the Station given that the local residents would receive no benefit from the Station, the increase was approved.

https://fileservice.eea.comacloud.net/fileservice.api/file/fileroom/12120936 (JA Vol.II.681-682).

In sum, the Station has a natural gas fired combustion turbine that emits Volatile Organic Compounds and hazardous air pollutants into multiple EJ communities in Quincy and Braintree. In consideration for receiving the Station's toxic emissions, the EJ communities of Quincy Point, Germantown and Braintree receive no discernible benefit. This is the definition of inequitable treatment that the Fourth Circuit Court of Appeals sought to curtail in Friends of Buckingham v. State Air Pollution Control Board, 947 F.3d 68, 87 (4th Cir. 2020) and that Massachusetts' law, effective June 26, 2021, An Act Creating a Next-Generation Roadmap for Massachusetts Climate Policy (Chapter 8 of the Acts of 2021) seeks to prevent. The EJ communities of Quincy Point, Germantown and Braintree sought the Commission's review during the midst of an unprecedented global pandemic. The Commission, however, declined to reconsider the current operation of the Station in light of materially changed circumstances since the project was authorized. Instead, the Order on Briefing stated in pertinent part:

27

19.  There is not sufficient record evidence of blowdown-related health effects to reasonably support the remedies Petitioners seek. The potential health impacts addressed in the record are not beyond the range of those contemplated by the Commission in the certificate proceeding, including the Environmental Assessment.  But we acknowledge  that the certificate proceeding did not consider how pandemic conditions can amplify project impacts on the local community or, specifically, environmental justice communities. We also acknowledge the evidence presented by the parties demonstrating that environmental justice communities in Massachusetts have been disproportionately adversely affected by the COVID-19 pandemic. . .

\*\*\*

22.  As discussed above, we recognize the legitimate health and safety concerns associated with the siting and operation of the Weymouth Compressor Station, together with Petitioners' allegations that outreach and engagement with affected environmental justice communities was insufficient.  Based, in part, on this kind of feedback, the Commission is taking steps that should allow better consideration of these types of issues early on in certificate proceedings, including revisiting the Commission's Pipeline Certificate Policy Statement and establishing an Office of Public Participation. While those actions will not resolve the concerns of the parties in this proceeding, and are unlikely to completely satisfy everyone, our aim is to ensure that, going forward, the Commission will be better able to address issues of concern to local communities, including environmental justice communities, as early and as completely as possible.

(Commission's Order on Briefing, at ¶¶ 19, 22) (footnotes omitted) (JA Vol.II.681-

682).  Incredibly, less than one month after the Order on Briefing, the Commission

issued an Updated Policy Statement on Certification of New Interstate Natural Gas

Facilities ("Updated Policy Statement") expanding the rights and protections

afforded to EJ communities that are subjected to new project development.

(Updated Policy Statement, JA Vol.IV.1403-1532).  The Updated Policy Statement

includes the following language:

28

…We will carefully examine cumulative impacts on environmental justice communities and encourage applicants to identify and submit any such data that may be relevant for the particular environmental justice communities affected by their proposed project.

91. The Commission will also consider measures to eliminate or mitigate a project's adverse impacts on environmental justice communities. We recognize that mitigation must be tailored to the needs of different environmental justice communities. This will require close consultation between the project developer, the communities in question, and the Commission, consistent with our *ex parte* regulations. [footnote omitted]

(FERC Updated Policy Statement, ¶¶ 90-91).  (JA Vol.IV.1465-1466).

Ultimately, the Commission's Order on Briefing declined to take further action on the grounds that a final, non-appealable order had issued, notwithstanding the citation to authority describing FERC's "broad remedial authority" to remedy its errors and correct "unjust situations."  (Commission's Order on Briefing, at ¶¶ 26-27, FN 75-76, JA Vol.III.1382-1383), citing TNA Merch. Projects, Inc. v. FERC, 857 F.3d 354, 359 (D.C. Cir. 2017) (where the court held that the Commission could order the separate remedy of recoupment under section 309, which the court found "vests FERC with broad remedial authority" to remedy its errors and correct "unjust situations."); Trunkline LNG Co., 22 FERC ¶ 61,245, at p. 61,442 (1983) (where the Commission declined to decide the "difficult question" of the extent of the Commission's authority to revoke or modify a certificate, but explained that if it did have the authority, it

would exercise it only upon "a compelling showing of a fundamental shift of a long-term nature in the basic premises on which the certificate was issued.")

      E.    <u>Algonquin's Own Policies Can Protect the Environmental Justice Communities of Quincy and Braintree By Using the Alternative Types of Compressor Station Used Elsewhere in Densely Populated Communities</u>

Enbridge, the parent company of Algonquin, publicly markets a document entitled "Net Zero by 2050" which states, in pertinent part, "Enbridge is reducing GHG emissions by modernizing and applying innovation to existing energy transportation and distribution systems to increase efficiency and reduce the emissions intensity of existing infrastructure." (Enbridge Net Zero by 2050, JA Vol.IV.930).   Enbridge is currently using ten or more Electric Motor Drives to drive natural gas compressor stations and, furthermore, the "first of several planned solar energy facilities to power electric compressors on Enbridge's natural gas transmission pipelines was placed into service at Lambertville, New Jersey, in October 2020. . . [Enbridge is] advancing the development of similar facilities at several other locations on our gas transmission network which are expected to come into service over the next two to three years." (Enbridge Net Zero by 2050, at 7, JA Vol.IV.931). Enbridge's stated business purpose is to "reduc[e] GHG emissions by modernizing and applying innovation to existing energy transportation and distribution systems to increase efficiency and reduce the emissions intensity of existing infrastructure." (<u>Id.</u> at 6, JA Vol.IV.930).

30

Importantly, when operating and maintaining an Electric Motor Drive,

Enbridge is able to negotiate the recovery of electric power costs from its

customers, as explained by Chris Harvey, Algonquin's Manager, Rates and

Certificates.  (Testimony of Christopher Harvey, at pp. 400-06, December 2, 2020)

(JA Vol.II.684-685).  The EA also recognized that use of electric-driven

compressor units would lower operating emissions, but wrongly concluded that an

electric motor drive would not be preferable to or offer a significant environmental

advantage over the natural gas fired combustion turbine compressor station, stating

in part:

> While the use of electric-driven compressor units would lower operating
> emissions, the proposed gas-driven compressor units can continue to meet
> the NAAQS, and electric-driven units would result in other environmental
> impacts (see table 3.3.2-1). Also, installation of electric-driven compressors
> would limit Algonquin's ability to satisfy the Project's schedule due to the
> time needed to permit, design, and construct these non-jurisdictional
> facilities; and would introduce new reliability concerns in the event of an
> electric power outage. In addition, indicated in table 3.3.2-1, the construction
> of new distribution lines would likely have additional visual impacts in the
> project area. In consideration of all these factors, we conclude that use of
> electric-driven compressor units would not be preferable to or offer a
> significant environmental advantage over the proposed Project facilities.

(EA, 3.3.2 Electric-driven Compressor Unit Alternative, at 3-7, 3-8) (JA Vol.I.51-

52).  The EJ communities of Quincy Point, Germantown and Braintree deserve

consideration and reevaluation of Electric Motor Drive and solar panel power

alternatives for the Station, especially during the COVID-19 pandemic.

31

After all, the EJ communities of Quincy Point, Germantown and Braintree will be faced with living, working and recreating in their communities while the Station is operating 24-hours a day, 365-day per year for the next 50 years.  The EA (issued May 2016) concluded "installation of electric-driven compressors would limit AGT's ability to satisfy the Project's schedule due to the time needed to permit, design, and construct these non-jurisdictional facilities".  EA, 3.3.2 Electric-driven Compressor Unit Alternative, at 3-7. (JA Vol.I.51-52).  That EA was flat wrong and requirement of an Electric Motor Drive or solar panel powered compressor station should not now be forsaken because of an incorrect EA assessment more than six years ago (in May 2016), especially where the quality of life for EJ communities of Quincy Point, Germantown and Braintree will be substantially improved by these cleaner technological solutions.

Chairman Glick's Concurrence to the Commission's Order on Briefing stated in pertinent part:

> In my opinion, the Commission likely erred in siting the Weymouth Compressor Station where it did. This facility is located in a heavily populated area that is home to two environmental justice communities. Those communities have borne a disproportionate burden from a legacy of industrial activity, including elevated rates of asthma, certain cancers, and other serious illnesses.  Particularly in light of that history, Petitioners' concern about the impacts of the Weymouth Compressor station and the blowdowns it has experienced is legitimate, understandable, and, frankly, inadequately assessed in the underlying certificate orders.

(Commission's Order on Briefing, *GLICK, Chairman, Concurring*, at ¶ 2, JA Vol.II.1385).

## SUMMARY OF THE ARGUMENT

Review of the Commission's decision is limited to determining whether the order was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" pursuant to 5 U.S.C. § 706(2)(A).  Myersville Citizens for a Rural Cmty., Inc. v. F.E.R.C., 783 F.3d 1301, 1308 (D.C. Cir. 2015).  The Commision's letter order granting Algonquin's request for extension of two-year deadline is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because it was issued on the morning after Christmas, only 34 minutes after notice of Algonquin's request for the extension was issued to the Commission's distribution list.  The Commision's Order Denying Rehearing is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law for the reasons set forth in then Commissioner (now Chairman) Glick's dissent, as well as because the Commission itself admitted that it deviated from its own standard practice.  The Commision's Order on Briefing is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because the Commission has failed to reevaluate the current operation of the Station in light of materially changed circumstances since the Station was authorized and further

33

failed to protect the EJ communities near the Station during the midst of an

unprecedented global pandemic.

## **ARGUMENT**

I.    <u>Commision's Letter Order Granting Algonquin's Request For Extension of Two-Year Deadline is Arbitrary, Capricious, an Abuse of Discretion, or Otherwise Not in Accordance With Law</u>.

On its face, it was arbitrary, capricious, an abuse of discretion and otherwise

not in accordance with law for the Commission to take only 34 minutes to approve

Algonquin's Request for Certificate Extension filed by Chris Harvey, Manager,

Rates and Certificates for Algonquin Gas Transmission, LLC, which was

distributed to FERC's distribution list at 11:17 a.m. on December 26, 2018.  (JA

Vol.I.178).  The Commission's letter order granting Algonquin's request for

extension of two-year deadline was distributed to FERC's distribution list at 11:51

a.m. on December 26, 2018, only 34 minutes after Algonquin's Request for

Certificate Extension was distributed to FERC's distribution list at 11:17 a.m.  (JA

Vol.I.175).  Indeed, even the Commission admitted that this procedure deviated

from the Commission's standard practice, stating, "[w]e agree that the Commission

as a whole should act on contested extensions of time to complete construction.

Indeed, the Commission generally does.  In this case, the OEP Director's designee

acted before the extension request was protested."  (Order Denying Rehearing,

¶39, n109, JA Vol.I.343).

"[B]oth the Supreme Court and this circuit have made clear that the Commission has a duty to use its § 7 power to protect consumers."  Missouri Pub. Serv. Comm'n v. F.E.R.C., 601 F.3d 581, 582–83 (D.C. Cir. 2010) (holding, where "[t]here is nothing in FERC's decision to suggest that it would have been impracticable to address the [subject at issue], yet FERC failed to do so. Because the agency's decision is the antithesis of 'reasoned decisionmaking',. . . we grant the petition for review, vacate FERC's order. . .and remand the case for a prompt resolution of the question. . ."), citing Allentown Mack Sales & Serv., Inc. v. NLRB, 522 U.S. 359, 375, 118 S.Ct. 818, 139 L.Ed.2d 797 (1998).  Here, the Commission taking only 34 minutes to approve Algonquin's Request for Certificate Extension filed by Chris Harvey, Manager, Rates and Certificates for Algonquin, which was distributed to FERC's distribution list at 11:17 a.m. on December 26, 2018, is the antithesis of "reasoned decisionmaking" and "there is nothing in FERC's decision to suggest that it would have been impracticable for the full Commission to address Algonquin's extension request, yet FERC failed to do so.  Id.  The fact that the Commission's departure from its standard practice occurred the morning after Christmas and served to deprive any parties in this contested proceeding from commenting upon or challenging Algonquin's request for an extension of time to complete construction renders the Commission's letter

order granting Algonquin's request for extension of two-year deadline arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.  Id.

Subdelegation is permitted, under 18 C.F.R. § 375.301, by a specified Commission official, such as the Director of OEP, to "the head of a division, or a comparable official" only where the Commission, in delegating functions to the Commission official, expressly permits Commission official to further delegate said functions.

With regard to subdelegation, 18 C.F.R. § 375.301(b) states, in full:

(b) Where the Commission, in delegating functions to specified Commission officials, permits an official to further delegate those functions to a designee of such official, *designee* shall mean the deputy of such official, the head of a division, or a comparable official as designated by the official to whom the direct delegation is made.

18 C.F.R. § 375.301(b) (emphasis in original).  Absent the determination that the Chief, Certificate Branch 1, OEP Division of Pipeline Certificates, had subdelegated the authority to issue the Commission's letter order granting Algonquin's request for extension of two-year deadline, such authority does not exist. Furthermore, 18 C.F.R. § 375.308 does not permit delegation to the Director of OEP, or the Director's designee, to issue letter orders granting requests for extension of deadlines on contested applications. To the contrary, 18 C.F.R. § 375.308 memorializes FERC's delegation of authorization to the Director of OEP, or the Director's designee, to take action consistent with 28 separate

36

subparagraphs, none of which include issuance of a letter order granting a request for extension of deadlines in contested applications by the Chief, Certificate Branch 1, OEP Division of Pipeline Certificates.

Delegations to the Director of the Office of Energy Projects, under 18 CFR § 375.308, states, in pertinent part:

> The Commission authorizes the Director or the Director's designee to:

> (a) Take appropriate action on uncontested applications and on applications for which the only motion or notice of intervention in opposition is filed by a competing preliminary permit or exemption applicant that does not propose and substantiate materially different plans to develop, conserve, and utilize the water resources of the region for the following:

> \*\*\*

> (w) Take appropriate action on the following:

> (1) Any notice of intervention or petition to intervene, filed in an **uncontested** application for pipeline facilities;

> (2) An **uncontested** request from one holding an authorization, granted pursuant to the Director's delegated authority, to vacate all or part of such authorization;

> \*\*\*

> (4) Applications for extensions of time to file required reports, data, and information and to perform other acts required at or within a specific time by any rule, regulation, license, permit, certificate, or order by the Commission;

18 CFR § 375.308(a) and (w) (emphasis added).

The Commission's letter order granting Algonquin's request for extension of two-year deadline cites 18 CFR § 375.308(w)(4) for subdelegation authority.  This regulation, however, expressly relates to delegations to the Director of OEP".

Although 18 CFR § 375.308(w)(4) authorizes "the Director or the Director's designee to. . .take appropriate action on the following…Applications for extensions of time to. . .perform other acts required at or within a specific time by any. . .order by the Commission", evidence that the Director of OEP expressly subdelegated authority to approve an extension of time to complete Algonquin's project to Chief, Certificate Branch 1, OEP Division of Pipeline Certificates, must be expressly designated.

Furthermore, the subdelegation of authority under 18 CFR § 375.308(w)(4) does not diminish the level of review required by FERC in response to a Request for Certificate Extension.  There is no evidence that any of the required additional procedural steps discussed in Rockies Express Pipeline LLC, 128 FERC ¶61,045 (2009) were undertaken prior to the issuance of the Commission's letter order granting Algonquin's request for extension of two-year deadline.  There is no evidence that the Director of OEP actually did subdelegate this authority to Chief, Certificate Branch 1, OEP Division of Pipeline Certificates to issue the Commission's letter order granting Algonquin's request for extension of two-year deadline to Request for Extension of Time to Complete Project.

If such evidence does exist, the Rockies Express Pipeline LLC decision specifies that such evidence should include internal documentation of the subdelegation, as well as information concerning the level of review completed by

38

Chief, Certificate Branch 1, OEP Division of Pipeline Certificates, including what additional staff in his division participated in such review prior to issuing the Commission's letter order granting Algonquin's request for extension of the two-year deadline. 128 FERC ¶61,045.

II.    <u>Commision's Order Denying Rehearing is Arbitrary, Capricious, an Abuse of Discretion, or Otherwise Not in Accordance With Law</u>.

Here, the Commission's admission that the procedure followed when the Commission's letter order granting Algonquin's request for extension of two-year deadline was issued actually deviated from the Commission's standard practice is telling.  (Order Denying Rehearing, ¶39, n109, JA Vol.I.343) (stating, "[w]e agree that the Commission as a whole should act on contested extensions of time to complete construction. Indeed, the Commission generally does.  In this case, the OEP Director's designee acted before the extension request was protested.")  The Commission's lack of reasoned decisionmaking is sufficient grounds for this Court to vacate the Commission's letter order granting Algonquin's request for extension of two-year deadline order denying rehearing as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

> The requirement of reasoned decisionmaking indisputably applies in situations involving judicial review of agency adjudicatory actions. *See, e.g., Allentown Mack Sales & Serv., Inc.,* 522 U.S. at 375, 118 S.Ct. 818 (noting that "[r]easoned decisionmaking ...promotes sound results, and unreasoned decisionmaking the opposite"). We will not uphold an agency adjudication where the agency's "judgment ... was neither adequately explained in its decision nor supported by agency precedent." *Siegel,* 592

F.3d at 164; *see also Coburn,* 679 F.3d at 926 (holding that because the agency decisions were "largely incomprehensible," they were "unworthy of any deference"); *Morall v. Drug Enforcement Admin.,* 412 F.3d 165, 167 (D.C. Cir. 2005) (vacating an agency decision due to "a lapse of reasonable and fair decisionmaking").

Fox v. Clinton, 684 F.3d 67, 74–75 (D.C. Cir. 2012). Importantly, if the Commission's process by which it decided the letter order granting Algonquin's request for extension of two-year deadline is not logical and rational, it cannot be reasoned decisionmaking and is, therefore, invalid. Michigan v. E.P.A., 576 U.S. 743, 750, 135 S. Ct. 2699, 2706, 192 L. Ed. 2d 674 (2015). The Supreme Court observed:

> Federal administrative agencies are required to engage in "reasoned decisionmaking." *Allentown Mack Sales & Service, Inc. v. NLRB,* 522 U.S. 359, 374, 118 S.Ct. 818, 139 L.Ed.2d 797 (1998) (internal quotation marks omitted). "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Ibid.* It follows that agency action is lawful only if it rests "on a consideration of the relevant factors." *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

Michigan, 576 U.S. at 750, 135 S. Ct. at 2706. Here, then Commissioner (now Chairman) Glick's dissent elaborated the numerous reasons why the process by which the Commission reached its result was illogical and irrational. (Order Denying Rehearing, Com. Glick, *dissenting* at 1-4) (JA Vol.I.346-349).

Clearly, Commissioner Glick's dissent drew the attention of the Commission's own errors to the Commission itself. In fact, the Commission

acknowledged Commissioner Glick's dissent, agreed that the Commission deviated from its standard practice, invoked a new rule to prevent this error from happening again, but somehow found way to justify, nay *excuse*, the error that occurred in this instance. (Order Denying Rehearing, ¶39 n109, JA Vol.I.343). This "we'll fix what happened later, but won't fix what happened now" decisionmaking was pure tone deafness, especially in light of these contested proceedings and the foresight of Congressman Lynch to request that the Commission deny any application by Algonquin for an extension to complete construction of the Station. (Congressman Stephen F. Lynch submits comments re the compressor station proposed by Spectra Energy etc. under CP16-9, dated January 3, 2018, filed February 22, 2018, JA Vol.I.163). At that time, FERC Chairman, Kevin J. McIntyre, responded to Congressmen Lynch, on March 21, 2018, stating, in pertinent part, "Algonquin has not to date made any requests for an extension of time, so there is no matter pending before the Commission for consideration." [Response to Congressman Stephen F. Lynch 1/03/18 letter re the Algonquin Gas Transmission LLC's (Algonquin) Atlantic Bridge Project under CP16-9, JA Vol.I.165]. Yet, when the request for an extension arrived the day after Christmas, the Commission deviated from its standard policy and granted the requested extension in 34 minutes, without following its standard practice of having each and all of the Commissioners consider the request. This deviation from standard procedure is the antithesis of

41

reasoned decisionmaking and requires that the Commission's letter order granting

Algonquin's request for extension of two-year deadline and Order Denying

Rehearing be vacated as arbitrary, capricious, an abuse of discretion and otherwise

not in accordance with law.  See <u>Fred Meyer Stores, Inc. v. Nat'l Lab. Rels. Bd.</u>,

865 F.3d 630, 639 (D.C. Cir. 2017) (observing, "[t]he Board's tone deafness—

even after the dissent drew attention to the error—is the antithesis of "reasoned

decisionmaking.")

## III.   Commission's Order Concluding There Was Not A Sufficient Change in Core Circumstances To Provide Basis for Further Review is Arbitrary, Capricious, an Abuse of Discretion, or Otherwise Not in Accordance With Law

Pursuant to 15 U.S.C. § 717o, Administrative powers of Commission; rules,

regulations, and orders, "The Commission shall have power to perform any and all

acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and

regulations as it may find necessary or appropriate to carry out the provisions of

this chapter."  Such powers grant to the Commission the ability to establish public

safety as it pertains to the construction and operation of the Station or any similar

facility.  Reopening (Rule 716), 18 CFR § 385.716, expressly gives FERC the

authority to reopen the record and states, in pertinent part:

> (a) *General rule.* To the extent permitted by law, the presiding officer or the Commission may, for good cause under paragraph (c) of this section, reopen the evidentiary record in a proceeding for the purpose of taking additional evidence.

***

42

(c) *By action of the presiding officer or the Commission.* If the presiding officer or the Commission, as appropriate, has reason to believe that reopening of a proceeding is warranted by any changes in conditions of fact or of law or by the public interest, the record in the proceeding may be reopened by the presiding officer before the initial or revised initial decision is served or by the Commission after the initial decision or, if appropriate, the revised initial decision is served.

As explained by this Court, "a change in 'core' circumstances" constitutes

reversible error in FERC's refusal to reopen the record of a proceeding:

The standard of review of such decisions, however, is very narrow, *see Eastern Carolinas Broadcasting Co. v. FCC,* 762 F.2d 95, 103 (D.C. Cir. 1985), and we would find a reversible error only when the new developments "rise[ ] to the level of a change in 'core' circumstances."

Oklahoma Nat. Gas Co., a Div. of ONEOK, 940 F.2d 699, 704 (D.C. Cir. 1991)

(citations omitted).  Here, the new developments including three unplanned

emergency shutdowns, as noted in the PHMSA Corrective Action Order (JA

Vol.II.694-700), and the Root Cause Analyses, (JA Vol.II.702-781), coupled with

the threat the Station poses to the multiple EJ communities living near the Station

during the COVID-19 pandemic (as noted in the A.G. Report, at 2-9, JA

Vol.II.849-855),  constitute extraordinary circumstances and a change in core

circumstances requiring FERC to reopen the record and constituting reversible

where FERC failed to do so.  Oklahoma Nat. Gas Co., 940 F.2d at 704.

FERC "may" reopen the record if FERC "has reason to believe that [doing so] is warranted by any changes in conditions of fact or of law." 18 C.F.R. § 385.716(c). Changes always occur after closing the record, so such discretion "is reserved for extraordinary circumstances." *Cities of Campbell v. FERC*, 770 F.2d 1180, 1191 (D.C. Cir. 1985). FERC need not "hold[ ] an

evidentiary hearing open indefinitely," waiting for a party to "figur[e] out what its story really is." *Id.* at 1191–92. We are similarly reluctant to remand for further proceedings absent a change "that is not merely 'material' but ... goes to the very heart of the case." *Greater Bos. Television Corp. v. FCC*, 463 F.2d 268, 283 (D.C. Cir. 1971).

SFPP, L.P. v. Fed. Energy Regul. Comm'n, 967 F.3d 788, 797 (D.C. Cir. 2020).

Importantly, if the Commission's process by which it decided the Order on Briefing is not logical and rational, it cannot be reasoned decisionmaking and is, therefore, invalid. Fox, 684 F.3d at 74–75; Michigan, 576 U.S. at 750, 135 S. Ct. at 2706. The Supreme Court observed:

> Federal administrative agencies are required to engage in "reasoned decisionmaking." *Allentown Mack Sales & Service, Inc. v. NLRB,* 522 U.S. 359, 374, 118 S.Ct. 818, 139 L.Ed.2d 797 (1998) (internal quotation marks omitted). "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Ibid.* It follows that agency action is lawful only if it rests "on a consideration of the relevant factors."

Michigan, 576 U.S. at 750, 135 S. Ct. at 2706 (citations omitted).

Here, having expressly "recognize[d] the very serious concerns raised by Petitioners and others regarding the operation of the project facilities in their community and in proximity to their homes and businesses. . .two unplanned blowdowns in the span of three weeks is concerning. . .particularly those releasing significant volumes of natural gas, naturally raise health and safety concerns for those that live in the local communities", it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law for FERC's decisionmaking to

44

stop short of taking further action.  Env't Def. Fund v. FERC, 2 F.4th 953, 975

(D.C. Cir. 2021), cert. denied sub nom. Spire Missouri Inc. v. Env't Def. Fund, 142

S. Ct. 1668 (2022) (holding, "FERC's ostrich-like approach flies in the face of the

guidelines set forth in the Certificate Policy Statement. The challenges raised by

EDF and others were more than enough to require the Commission to "look

behind" the precedent agreement in determining whether there was market need. If

it was not necessary for the Commission to do so under these circumstances, it is

hard to imagine a set of facts for which it would ever be required. Because the

Commission declined to engage with EDF's arguments and the underlying

evidence regarding self-dealing, its decisionmaking was arbitrary and capricious.")

This Court held, "[w]hen the Commission's explanation for a contested action is

lacking or inadequate, it will not survive judicial review and the matter will be

returned to FERC for appropriate action."  Env't Def. Fund, 2 F.4th at 967–68.

The Commission's Order on Briefing must be vacated as arbitrary, capricious, an

abuse of discretion and otherwise not in accordance with law.  See Fred Meyer

Stores, 865 F.3d at 639 (noting, "[t]he Board's tone deafness-even after the dissent

drew attention to the error—is the antithesis of "reasoned decisionmaking.")

IV.  Commission's Order Concluding the COVID-19 Impact Upon
     Environmental Justice Communities Does Not Provide Basis for Further
     Review is Arbitrary, Capricious, an Abuse of Discretion, or Otherwise Not
     in Accordance With Law

A petitioner may challenge an agency's EJ analysis as arbitrary and
capricious under the Administrative Procedure Act (APA).  Vecinos para el
Bienestar de la Comunidad Costera v. FERC, 6 F.4th 1321, 1330 (D.C. Cir. 2021)
(observing, "[a]lthough the executive order requiring agencies to assess the
environmental effects of their actions on environmental justice communities
expressly states that it does not create a private right to judicial review, Executive
Order 12,898, § 6-609, 59 Fed. Reg. at 7,632–33, a petitioner may challenge an
agency's environmental justice analysis as arbitrary and capricious under NEPA
and the APA.") (citation omitted).  This Court explained:

> Apart from NEPA, Executive Order 12,898, § 1-101, 59 Fed. Reg. 7,629
> (Feb. 11, 1994), requires that, "[t]o the greatest extent practicable and
> permitted by law," federal agencies "shall make achieving environmental
> justice part of [their] mission by identifying and addressing, as appropriate,
> disproportionately high and adverse human health or environmental effects
> of [their] programs, policies, and activities on minority populations and low-
> income populations." Id. To that end, the Order requires federal agencies to
> conduct "environmental justice" analyses by "collect[ing], maintain[ing],
> and analyz[ing] information on the race, national origin, income level, and
> other readily accessible and appropriate information for areas surrounding
> facilities or sites expected to have a substantial environmental, human
> health, or economic effect on the surrounding populations." Id. § 3-302(b).

Vecinos para el Bienestar de la Comunidad Costera, 6 F.4th at 1326.  This Court
has previously found the Commission's EJ analysis was arbitrary because it was

not "reasonable and adequately explained," and did not include "a rational connection between the facts found and the decision made". Id. at 1330.

The Fourth Circuit Court of Appeals recently expounded upon the importance of EJ review when it vacated an air permit issued by the Virginia State Air Pollution Control Board ("the Board") in connection with the proposed construction of a natural gas compressor station in the historic community of Union Hill in Buckingham County, Virginia. Friends of Buckingham, 947 F.3d at 87 (holding, ". . .it is clear to us that the Board's EJ review was insufficient, which undermines the Board's statutory duties and renders the Board's Permit decision arbitrary and capricious, and unsupported by substantial evidence.") In its decision, the Fourth Circuit quoted Justice Douglas when explaining the important purpose of EJ analysis. Id. at 87 (quoting, "The purpose of an environmental justice analysis is to determine whether a project will have a disproportionately adverse effect on minority and low income populations.") Critical to its conclusion, the Fourth Circuit held that the Board failed to consider the disproportionate impact of the proposed compressor station emission upon the EJ community living closest to the proposed compressor station location:

> The Board's reliance on air quality standards led it to dismiss EJ concerns. Even if all pollutants within the county remain below state and national air quality standards, the Board failed to grapple with the likelihood that those living closest to the Compressor Station -- an overwhelmingly minority population according to the Friends of Buckingham Survey -- will be affected more than those living in other parts of the same county. The Board

47

> rejected the idea of disproportionate impact on the basis that air quality
> standards were met. But environmental justice is not merely a box to be
> checked, and the Board's failure to consider the disproportionate impact on
> those closest to the Compressor Station resulted in a flawed analysis.

Friends of Buckingham, 947 F.3d at 91-92.  The Fourth Circuit concluded that

even "extensions of public comments and additional meetings ring hollow" where

there was failure to provide any explanation concerning the EJ issue.  Id. at 89.

Here, the Commission's Order on Briefing expressly recognizes that the EJ

review for the Station was completely inadequate.  (Order on Briefing, at ¶¶ 19, 22

and GLICK, Chairman, Concurring, at ¶¶ 2-4) (JA Vol.III.1378-1380, 1385-1386).

In fact, the Commission's EJ review for the Station was so facially deficient that

FERC apologized to the Petitioners, stated that the Station would not be approved

if the application were submitted today and, less than one month after issuing the

Order on Briefing, published the Updated Policy Statement forever expanding EJ

protections and review for all future natural gas infrastructure projects.  (JA

Vol.IV.1403-1542).  This is not enough.  This is not enough for the EJ

communities of Quincy and Braintree who must live, work, recreate and breathe

the air surrounding the Station which is designed to operate 24-hours a day, 365-

days per year for its life expectancy of 50 years.  It is not enough for the EJ

communities of Quincy and Braintree to tell their grandchildren in the year 2072

that FERC promised to improve its practices for EJ communities for all projects

reviewed after the Station.

Massachusetts law has changed (Chapter 8 of the Acts of 2021) and FERC

Policy has changed (Updated Policy Statement) (JA Vol.III.861-923, Vol.IV.1403-

1542).  So should the review of this Station.  It is not unprecedented for

Environmental Impact Statements to be supplemented and, in this case, the EA

should be updated concerning the impact of the Station upon the EJ communities

of Quincy and Braintree, consistent with FERC's Updated Policy Statement.  See

Friends of the Earth v. Haaland, 583 F. Supp. 3d 113, 147 (D.D.C. 2002), appeal

dismissed in part sub nom., 2022 WL 4293098 (D.C. Cir. Apr. 15, 2022).  The

Friends of the Earth court stated:

> NEPA itself does not directly state when an agency must prepare a
> supplemental [Environmental Impact Statement], but as the Supreme Court
> has held, they are "at times necessary to satisfy [NEPA]'s 'action-forcing'
> purpose." *Marsh*, 490 U.S. at 370–71, 109 S.Ct. 1851. The relevant
> regulations make this abundantly clear by requiring agencies to "prepare
> supplements to either draft or final environmental impact statements if ...
> [t]here are significant new circumstances or information relevant to
> environmental concerns and bearing on the proposed action or its impacts."
> 40 C.F.R. § 1502.9(c)(1)(ii) (2019). "[T]he need for supplementation 'turns
> on the value of the new information to the still pending decisionmaking
> process.'" *Friends of Cap. Crescent Trail v. Fed. Transit Admin.*, 877 F.3d
> 1051, 1058 (D.C. Cir. 2017)

Friends of the Earth, 583 F. Supp. 3d at 147, *quoting* Marsh, 490 U.S. at 374, 109

S.Ct. 1851.

Here, the COVID-19 pandemic constitutes extraordinary new circumstances

critical to EJ concerns and bearing on the perpetual operation of the Station for the

next 50 years.  Moreover, the Order on Briefing resulted from a *still pending*

49

decisionmaking process which, in conjunction with new FERC Policy (Updated Policy Statement) and new Massachusetts law (Chapter 8 of the Acts of 2021) requires FERC to reevaluate the impact of the Station upon the EJ communities of Quincy and Braintree and apply these new FERC EJ standards before it is too late. See Friends of the Earth, 583 F. Supp. 3d at 147.

For the reasons set forth above, the Commission's Order on Briefing must be vacated as arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.  Friends of Buckingham, 947 F.3d at 91-92; Vecinos para el Bienestar de la Comunidad Costera, 6 F.4th at 1326-30.  Where the Petitioners are aggrieved by the Order Denying Rehearing and the Order on Briefing, they are "within the zone of interests to be protected or regulated," and, pursuant to this Court's authority to review Commission Orders pursuant to 15 U.S.C. § 717r(b), the Petitioners respectfully request that the Order Denying Rehearing and Order on Briefing be vacated and the proceedings concerning the Station be remanded to FERC for further evaluation concerning whether the Station should operate at all.

## CONCLUSION AND RELIEF SOUGHT

WHEREFORE, the Petitioners City of Quincy, MA, FRRACS, Rebecca Haugh, Michael H. Hayden and Food & Water Watch, respectfully request an Order vacating, reversing or rescinding the Commission's Order Denying Rehearing issued by the Commission on February 21, 2020 and the Commission's December 26, 2019 letter order granting Algonquin's request for extension of two-year deadline, such that the Commission's two-year extension of the January 25, 2019 deadline to complete construction of the Station is vacated, operation of the Station be suspended and the proceedings concerning the Station be remanded back to the Commission for further review concerning whether the Station, as constructed, should be permitted to continue operations.

WHEREFORE, the Petitioners, City of Quincy, MA, FRRACS and Town of Braintree, MA, respectfully request an Order vacating, reversing or rescinding the Commission's Order on Briefing and Addressing Arguments Raised on Rehearing issued by the Commission on January 20, 2022, such that the Order on Briefing is vacated, operation of the Station be suspended and the proceedings concerning the Station be remanded back to the Commission for further review concerning whether the Station, as constructed, should be permitted to continue operations.

Respectfully submitted,
CITY OF QUINCY, MA,
REBECCA HAUGH, MICHAEL HAYDEN
and FORE RIVER RESIDENTS AGAINST
THE COMPRESSOR STATION,
By Their Attorney,

/s/ *Michael H. Hayden*
Michael H. Hayden (No. 1139860)
mhayden@morrisonmahoney.com
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA 02210-1181
Phone: 617-439-7500

Dated: March 9, 2023

THE TOWN OF BRAINTREE,
By Its Attorney,

/s/ *Crystal Huff*
Crystal Huff (No. 1197899)
chuff@braintreema.gov
Office of the Town Solicitor
Town of Braintree
One JFK Memorial Drive
Braintree, MA 02184
Phone: 781-794-8150

FOOD & WATER WATCH,
By Its Attorney,

/s/ *Adam Carlesco*
Adam Carlesco
D.C. Court of Appeals No.: 1601151
Food & Water Watch
1616 P Street NW, Suite 300
Washington, DC 20036
Phone: 202-683-4295
acarlesco@fwwatch.com

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1.    This brief complies with the type-volume limit of this Court's Order dated August 16, 2022 because this brief contains 12,855 words, excluding the parts of the document exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(f), with the word count computed by Microsoft Word.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in Times New Roman 14-point font using Microsoft Word.

This brief has been scanned for viruses and is virus free.

Dated:  March 9, 2023

/s/ *Michael H. Hayden*
Michael H. Hayden, Esq.

## <u>CERTIFICATE OF FILING SERVICE</u>

I hereby certify that, on March 9, 2023, I caused a true and correct copy of the

foregoing FINAL OPENING BRIEF OF PETITIONERS, CITY OF QUINCY, ET

AL., to be served upon all registered counsel via the D.C. Circuit Court of Appeals'

CM/ECF system.


/s/ *<u>Michael H. Hayden</u>*
Michael H. Hayden, Esq.

# ADDENDUM OF STATUTES AND REGULATIONS

5 U.S.C. § 706……...………………………………………………………………Add. 1

15 U.S.C. § 717f…………………………………………………………………...Add. 2

15 U.S.C. § 717o.………………………………………………………………….Add. 5

15 U.S.C. § 717r………………………………………………………………...Add. 6

42 U.S.C. § 4332………………………………………………………………...Add. 8

18 C.F.R. § 375.301……………………………………………………………Add. 10

18 C.F.R. § 375.308……………………………………………………………Add. 11

18 C.F.R. § 385.716……………………………………………………………Add. 17

40 C.F.R. § 1502.9……………………………………………………………..Add. 18

49 C.F.R. § 192.163 …………………………………………………………...Add. 19

## 5 U.S.C. §706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

   (1) compel agency action unlawfully withheld or unreasonably delayed; and

   (2) hold unlawful and set aside agency action, findings, and conclusions found to be—

      (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

      (B) contrary to constitutional right, power, privilege, or immunity;

      (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

      (D) without observance of procedure required by law;

      (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

      (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

# 15 U.S.C. §717f. Construction, extension, or abandonment of facilities

**(a) Extension or improvement of facilities on order of court; notice and hearing**

   Whenever the Commission, after notice and opportunity for hearing, finds such action necessary or desirable in the public interest, it may by order direct a natural-gas company to extend or improve its transportation facilities, to establish physical connection of its transportation facilities with the facilities of, and sell natural gas to, any person or municipality engaged or legally authorized to engage in the local distribution of natural or artificial gas to the public, and for such purpose to extend its transportation facilities to communities immediately adjacent to such facilities or to territory served by such natural-gas company, if the Commission finds that no undue burden will be placed upon such natural-gas company thereby: Provided, That the Commission shall have no authority to compel the enlargement of transportation facilities for such purposes, or to compel such natural-gas company to establish physical connection or sell natural gas when to do so would impair its ability to render adequate service to its customers.

**(b) Abandonment of facilities or services; approval of Commission**

   No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment.

**(c) Certificate of public convenience and necessity**

   (1)(A) No natural-gas company or person which will be a natural-gas company upon completion of any proposed construction or extension shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission, or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations: Provided, however, That if any such natural-gas company or predecessor in interest was bona fide engaged in transportation or sale of natural gas, subject to the jurisdiction of the Commission, on February 7, 1942, over the route or routes or within the area for which application is made and has so operated since that time, the Commission shall issue such certificate without requiring further proof that public convenience and necessity will be served by such operation, and without further proceedings, if application for such certificate is made to the Commission within ninety days after February 7, 1942. Pending the determination of any such application, the continuance of such operation shall be lawful.

   (B) In all other cases the Commission shall set the matter for hearing and shall give such reasonable notice of the hearing thereon to all interested persons as in its judgment may be necessary under rules and regulations to be prescribed by the Commission; and the application shall be decided in accordance with the procedure provided in subsection (e) of this section and such certificate shall be issued or denied accordingly: Provided, however, That the Commission may issue a temporary certificate in cases of emergency, to assure maintenance of adequate service or to serve particular customers, without notice or hearing, pending the determination of an application for a certificate, and may by regulation exempt from the requirements of this

Add. 2

section temporary acts or operations for which the issuance of a certificate will not be required in the public interest.

(2) The Commission may issue a certificate of public convenience and necessity to a natural-gas company for the transportation in interstate commerce of natural gas used by any person for one or more high-priority uses, as defined, by rule, by the Commission, in the case of—

(A) natural gas sold by the producer to such person; and

(B) natural gas produced by such person.

**(d) Application for certificate of public convenience and necessity**

Application for certificates shall be made in writing to the Commission, be verified under oath, and shall be in such form, contain such information, and notice thereof shall be served upon such interested parties and in such manner as the Commission shall, by regulation, require.

**(e) Granting of certificate of public convenience and necessity**

Except in the cases governed by the provisos contained in subsection (c)(1) of this section, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied. The Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require.

**(f) Determination of service area; jurisdiction of transportation to ultimate consumers**

(1) The Commission, after a hearing had upon its own motion or upon application, may determine the service area to which each authorization under this section is to be limited. Within such service area as determined by the Commission a natural-gas company may enlarge or extend its facilities for the purpose of supplying increased market demands in such service area without further authorization; and

(2) If the Commission has determined a service area pursuant to this subsection, transportation to ultimate consumers in such service area by the holder of such service area determination, even if across State lines, shall be subject to the exclusive jurisdiction of the State commission in the State in which the gas is consumed. This section shall not apply to the transportation of natural gas to another natural gas company.

**(g) Certificate of public convenience and necessity for service of area already being served**

Nothing contained in this section shall be construed as a limitation upon the power of the Commission to grant certificates of public convenience and necessity for service of an area already being served by another natural-gas company.

**(h) Right of eminent domain for construction of pipelines, etc.**

When any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line or pipe lines for the transportation of natural gas, and the necessary land or other property, in addition to right-of-

Add. 3

way, for the location of compressor stations, pressure apparatus, or other stations or equipment necessary to the proper operation of such pipe line or pipe lines, it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located, or in the State courts. The practice and procedure in any action or proceeding for that purpose in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated: Provided, That the United States district courts shall only have jurisdiction of cases when the amount claimed by the owner of the property to be condemned exceeds $3,000.

(June 21, 1938, ch. 556, §7, 52 Stat. 824; Feb. 7, 1942, ch. 49, 56 Stat. 83; July 25, 1947, ch. 333, 61 Stat. 459; Pub. L. 95–617, title VI, §608, Nov. 9, 1978, 92 Stat. 3173; Pub. L. 100–474, §2, Oct. 6, 1988, 102 Stat. 2302.)

## 15 U.S.C. §717o. Administrative powers of Commission; rules, regulations, and orders

   The Commission shall have power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this chapter. Among other things, such rules and regulations may define accounting, technical, and trade terms used in this chapter; and may prescribe the form or forms of all statements, declarations, applications, and reports to be filed with the Commission, the information which they shall contain, and the time within which they shall be filed. Unless a different date is specified therein, rules and regulations of the Commission shall be effective thirty days after publication in the manner which the Commission shall prescribe. Orders of the Commission shall be effective on the date and in the manner which the Commission shall prescribe. For the purposes of its rules and regulations, the Commission may classify persons and matters within its jurisdiction and prescribe different requirements for different classes of persons or matters. All rules and regulations of the Commission shall be filed with its secretary and shall be kept open in convenient form for public inspection and examination during reasonable business hours.

(June 21, 1938, ch. 556, §16, 52 Stat. 830.)

## 15 U.S.C. §717r. Rehearing and review

### (a) Application for rehearing; time

Any person, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

### (b) Review of Commission order

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the court of appeals of the United States for any circuit wherein the natural-gas company to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings, which is supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of title 28.

**(c) Stay of Commission order**

The filing of an application for rehearing under subsection (a) shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

**(d) Judicial review**

**(1) In general**

The United States Court of Appeals for the circuit in which a facility subject to section 717b of this title or section 717f of this title is proposed to be constructed, expanded, or operated shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit, license, concurrence, or approval (hereinafter collectively referred to as "permit") required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.).

**(2) Agency delay**

The United States Court of Appeals for the District of Columbia shall have original and exclusive jurisdiction over any civil action for the review of an alleged failure to act by a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.), for a facility subject to section 717b of this title or section 717f of this title. The failure of an agency to take action on a permit required under Federal law, other than the Coastal Zone Management Act of 1972, in accordance with the Commission schedule established pursuant to section 717n(c) of this title shall be considered inconsistent with Federal law for the purposes of paragraph (3).

**(3) Court action**

If the Court finds that such order or action is inconsistent with the Federal law governing such permit and would prevent the construction, expansion, or operation of the facility subject to section 717b of this title or section 717f of this title, the Court shall remand the proceeding to the agency to take appropriate action consistent with the order of the Court. If the Court remands the order or action to the Federal or State agency, the Court shall set a reasonable schedule and deadline for the agency to act on remand.

**(4) Commission action**

For any action described in this subsection, the Commission shall file with the Court the consolidated record of such order or action to which the appeal hereunder relates.

**(5) Expedited review**

The Court shall set any action brought under this subsection for expedited consideration.

(June 21, 1938, ch. 556, §19, 52 Stat. 831; June 25, 1948, ch. 646, §32(a), 62 Stat. 991; May 24, 1949, ch. 139, §127, 63 Stat. 107; Pub. L. 85–791, §19, Aug. 28, 1958, 72 Stat. 947; Pub. L. 109–58, title III, §313(b), Aug. 8, 2005, 119 Stat. 689.)

## 42 U.S.C. § 4332. Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall--

**(A)** utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

**(B)** identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

**(C)** include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on--

**(i)** the environmental impact of the proposed action,

**(ii)** any adverse environmental effects which cannot be avoided should the proposal be implemented,

**(iii)** alternatives to the proposed action,

**(iv)** the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

**(v)** any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

**(D)** Any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:

**(i)** the State agency or official has statewide jurisdiction and has the responsibility for such action,

**(ii)** the responsible Federal official furnishes guidance and participates in such preparation,

**(iii)** the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

**(iv)** after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land

management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this chapter; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction.[1]

**(E)** study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

**(F)** recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

**(G)** make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

**(H)** initiate and utilize ecological information in the planning and development of resource-oriented projects; and

**(I)** assist the Council on Environmental Quality established by subchapter II of this chapter.

(Pub.L. 91-190, Title I, § 102, Jan. 1, 1970, 83 Stat. 853; Pub.L. 94-83, Aug. 9, 1975, 89 Stat. 424.)

## 18 C.F.R. § 375.301 Purpose and Subdelegations

(a) The purpose of this subpart is to set forth the authorities that the Commission has delegated to staff officials. Any action by a staff official under the authority of this subpart may be appealed to the Commission in accordance with § 385.1902 of this chapter.

(b) Where the Commission, in delegating functions to specified Commission officials, permits an official to further delegate those functions to a designee of such official, designee shall mean the deputy of such official, the head of a division, or a comparable official as designated by the official to whom the direct delegation is made.

(c) For purposes of Subpart C, uncontested and in uncontested cases mean that no motion to intervene, or notice of intervention, in opposition to the pending matter made under § 385.214 (intervention) has been received by the Commission.

[Order 112, 45 FR 79025, Nov. 28, 1980, as amended by Order 225, 47 FR 19058, May 3, 1982; Order 492, 53 FR 16062, May 5, 1988]

## 18 C.F.R. § 375.308 Delegations to the Director of the Office of Energy Projects.

The Commission authorizes the Director or the Director's designee to:

**(a)** Take appropriate action on uncontested applications and on applications for which the only motion or notice of intervention in opposition is filed by a competing preliminary permit or exemption applicant that does not propose and substantiate materially different plans to develop, conserve, and utilize the water resources of the region for the following:

   **(1)** Licenses (including original, new, and transmission line licenses) under part I of the Federal Power Act;

   **(2)** Exemptions from all or part of the licensing requirements of part I of the Federal Power Act; and

   **(3)** Preliminary permits for proposed projects.

**(b)** Take appropriate action on uncontested applications for:

   **(1)** Amendments (including changes in the use or disposal of water power project lands or waters or in the boundaries of water power projects) to licenses (including original, new, and transmission line licenses) under part I of the Federal Power Act, exemptions from all or part of the requirements of part I of the Federal Power Act, and preliminary permits; and

      **(2)** Surrenders of licenses (including original and new), exemptions, and preliminary permits.

**(c)** Take appropriate action on the following:

   **(1)** Determinations or vacations with respect to lands of the United States reserved from entry, location, or other disposal under section 24 of the Federal Power Act;

   **(2)** Transfer of a license under section 8 of the Federal Power Act;

   **(3)** Applications for the surrender of transmission line licenses pursuant to part 6 of this chapter;

   **(4)** Motions filed by licensees, permittees, exemptees, applicants, and others requesting an extension of time to file required submittals, reports, data, and information and to do other acts required to be done at or within a specific time period by any rule, regulation, license, exemption, permit, notice, letter, or order of the Commission in accordance with § 385.2008 of this chapter;

   **(5)** Declarations of intent and petitions for declaratory orders concerning the Commission's jurisdiction over a hydropower project under the Federal Power Act;

   **(6)** New or revised exhibits, studies, plans, reports, maps, drawings, or specifications, or other such filings made voluntarily or in response to a term or condition in a preliminary permit, license, or exemption issued for a hydropower project, or in response to the requirements of an order of the Commission or presiding officer's initial decision concerning a hydropower project;

**(7)** Requests by applicants to withdraw, pursuant to § 385.216 of this chapter, any pleadings under part I of the Federal Power Act and any pleadings related to exemptions from all or part of part I of the Federal Power Act;

**(8)** Requests by licensees for exemption from:

    **(i)** The requirement of filing FERC Form No. 80, Licensed Projects Recreation, under § 8.11 of this chapter; and

    **(ii)** The fees prescribed in § 381.302(a) of this chapter in accordance with § 381.302(c) of this chapter and the fees in § 381.601 of this chapter, in accordance with § 381.106 of this chapter;

**(9)** Requests for waivers incidental to the exercise of delegated authority provided the request conforms to the requirements of § 385.2001 of this chapter;

**(10)** Proposals for the development of water resources projects submitted by other agencies of the Federal government for Commission review or comment. The Director shall direct comments, when necessary, to the sponsoring agency on matters including, but not limited to, the need for, and appropriate size of, any hydroelectric power installation proposed by any other agency of the Federal government;

**(11)** The reasonableness of disputed agency cost statements pursuant to § 4.303(e) of this chapter.

**(d)** Issue an order pursuant to section 5 of the Federal Power Act to cancel a preliminary permit if the permittee fails to comply with the specific terms and conditions of the permit; provided:

    **(1)** The Director gives notice to the permittee of probable cancellation no less than 30 days prior to the issuance of the cancellation order, and

    **(2)** The permittee does not oppose the issuance of the cancellation order.

**(e)** Issue an order to revoke an exemption of a small conduit hydroelectric facility from the licensing provisions of part I of the Federal Power Act granted pursuant to § 4.93 of this chapter, or an exemption of a small hydroelectric power project from the licensing provisions of part I of the Federal Power Act granted pursuant to § 4.105 of this chapter if the exemption holder fails to begin or complete actual construction of the exempted facility or project within the time specified in the order granting the exemption or in Commission regulations at § 4.94(c) or § 4.106(c) of this chapter, provided:

    **(1)** The Director gives notice to the exemption holder by certified mail of probable revocation no less than 30 days prior to the issuance of the revocation order, and

    **(2)** The holder of the exemption does not oppose the issuance of the revocation order.

**(f)** Issue an order pursuant to section 13 of the Federal Power Act to terminate a license granted under part I of the Federal Power Act if the licensee fails to commence actual construction of the project works within the time prescribed in the license, provided:

    **(1)** The Director gives notice by certified mail to the licensee of probable termination no less than 30 days prior to the issuance of the termination order, and

**(2)** The licensee does not oppose the issuance of the termination order.

**(g)** Require licensees and applicants for water power projects to make repairs to project works, take any related actions for the purpose of maintaining the safety and adequacy of such works, make or modify emergency action plans, have inspections by independent consultants, and perform other actions necessary to comply with part 12 of this chapter or otherwise protect human life, health, property, or the environment.

**(h)** For any unlicensed or unexempted hydropower project, take the following actions:

**(1)** Conduct investigations to ascertain the Commission's jurisdiction,

**(2)** Make preliminary jurisdictional determinations, and

**(3)** If a project has been preliminarily determined to require a license, issue notification of the Commission's jurisdiction; require the filing of a license application; and require that actions necessary to comply with part 12 of this chapter or otherwise protect human life, health, property, or the environment are taken.

**(i)** Take appropriate action on uncontested settlements among non-Federal parties involving headwater benefits.

**(j)** Dismiss applications for licenses and approve the withdrawal of applications for hydropower project licenses, in instances where no petition for or notice of intervention contending that licensing is required under part I of the Federal Power Act has been filed and the Director determines that licensing is not required by such Part I.

**(k)** Reject or dismiss an application filed under Part I of the Federal Power Act or an application for an exemption from some or all of the requirements of Part I of the Federal Power Act if:

**(1)** An application is patently deficient under § 4.32(e)(2)(i);

**(2)** A revised application

**(i)** Does not conform to the requirements of §§ 4.32(a), 4.32(b), or 4.38, under § 4.32(d)(1) or

**(ii)** If revisions to an application are not timely submitted under § 4.32(e)(1)(iii); or

**(3)** The applicant fails to provide timely additional information, documents, or copies of submitted materials under § 4.32(g).

**(l)** Redesignate proceedings, licenses, and other authorizations and filings to reflect changes in the names of persons and municipalities subject to or invoking Commission jurisdiction under the Federal Power Act, where no substantive changes in ownership, corporate structure or domicile, or jurisdictional operation are involved.

**(m)** Determine payments for headwater benefits from the operation of Federal reservoir projects.

**(n)** Determine whether to allow a credit against annual charges for the use of government dams or other structures billed to licensees each year for contractual payments for the construction, operation, and maintenance of a Federal dam.

**(o)** Prepare and issue comments on general water policy and planning issues for the use of the Director of the Water Resources Council or the Assistant Secretaries of the Department of Energy.

**(p)** Prepare and transmit letters concerning power site lands to the Bureau of Land Management and the U.S. Geological Survey; respond to routine requests for information and any non-docketed correspondence; prepare and transmit letters requesting comments or additional information on applications for hydropower project licenses, preliminary permits, exemptions, amendments of licenses, permits, or exemptions, and other similar matters from Federal, state, and local agencies, from applicants, and from other appropriate persons; and prepare and transmit letters regarding whether transmission lines are works of a hydropower project and are required to be licensed.

**(q)** Reject an application or other filing under Section 405 of the Public Utility Regulatory Policies Act of 1978, unless accompanied by a request for waiver in conformity with § 385.2001 of this chapter, if it fails patently to comply with applicable statutory requirements or Commission rules, regulations, and orders.

**(r)** Pass upon petitions filed under §§ 292.210 and 292.211 of this chapter.

**(s)** Make any preliminary determination of inconsistency between a fish and wildlife agency's fish and wildlife recommendation and applicable law, and conduct through staff whatever consultation with the agency that is necessary or appropriate in order to attempt to resolve any inconsistency, under section 10(j) of the Federal Power Act, and to take such related actions as are required under that section.

**(t)** Waive the pre-filing consultation requirements in §§ 4.38 and 16.8 of this title whenever the Director, in his discretion, determines that an emergency so requires, or that the potential benefit of expeditiously considering a proposed improvement in safety, environmental protection, efficiency, or capacity outweighs the potential benefit of requiring completion of the consultation process prior to the filing of an application.

**(u)** Approve, on a case-specific basis, and issue such orders as may be necessary in connection with the use of alternative procedures, under § 4.34(i) of this chapter, for the development of an application for an original, new or subsequent license, exemption, or license amendment subject to the pre-filing consultation process, and assist in the pre-filing consultation and related processes.

**(v)** Take appropriate action on the following types of uncontested applications for authorizations and uncontested amendments to applications and authorizations and impose appropriate conditions:

    **(1)** Applications or amendments requesting authorization for the construction or acquisition and operation of facilities that have a construction or acquisition cost less than the limits specified in column 2 of table I in § 157.208(d) of this chapter;

    **(2)** Applications by a pipeline for the abandonment of pipeline facilities;

    **(3)** Applications for temporary certificates for facilities pursuant to § 157.17 of this chapter;

    **(4)** Petitions to amend certificates to conform to actual construction;

**(5)** Applications for temporary certificates for facilities pursuant to § 157.17 of this chapter;

**(6)** Dismiss any protest to prior notice filings made pursuant to § 157.205 of this chapter and involving pipeline facilities that does not raise a substantive issue and fails to provide any specific detailed reason or rationale for the objection;

**(7)** Applications for temporary or permanent certificates (and for amendments thereto) for the transportation, exchange or storage of natural gas, provided that the cost of construction of the applicant's related facility is less than the limits specified in column 2 of table 1 in § 157.208(d) of this chapter; and

**(8)** Applications for blanket certificates of public convenience and necessity pursuant to subpart F of part 157 of this chapter, including waiver of project cost limitations in §§ 157.208 and 157.215 of this chapter, and the convening of informal conferences during the 30-day reconciliation period pursuant to the procedures in § 157.205(f).

**(w)** Take appropriate action on the following:

**(1)** Any notice of intervention or petition to intervene, filed in an uncontested application for pipeline facilities;

**(2)** An uncontested request from one holding an authorization, granted pursuant to the Director's delegated authority, to vacate all or part of such authorization;

**(3)** Petitions to permit after an initial 60-day period one additional 60-day period of exemption pursuant to § 284.264(b) of this chapter where the application or extension arrives at the Commission later than 45 days after the commencement of the initial period of exemption when the emergency requires installation of facilities;

**(4)** Applications for extensions of time to file required reports, data, and information and to perform other acts required at or within a specific time by any rule, regulation, license, permit, certificate, or order by the Commission; and

**(5)** Requests for waiver of the landowner notification requirements in § 157.203(d) of this chapter.

**(x)** Undertake the following actions:

**(1)** Compute, for each calendar year, the project limits specified in table I of § 157.208 and table II of § 157.215(a) of this chapter, adjusted for inflation, and publish such limits as soon as possible thereafter in the FEDERAL REGISTER;

**(2)** Issue reports for public information purposes. Any report issued without Commission approval must:

**(i)** Be of a noncontroversial nature, and

**(ii)** Contain the statement, "This report does not necessarily reflect the view of the Commission," in bold face type on the cover;

**(3)** Issue and sign deficiency letters regarding natural gas applications;

**(4)** Accept for filing, data and reports required by Commission orders, or presiding officers' initial decisions upon which the Commission has taken no further action, if such filings are in

Add. 15

compliance with such orders or decisions and, when appropriate, notify the filing party of such acceptance;

**(5)** Reject requests which patently fail to comply with the provisions of 157.205(b) of this chapter;

**(6)** Take appropriate action on requests or petitions for waivers of any action incidental to the exercise of delegated authority, including waiver of notice as provided in section 4(d) of the Natural Gas Act, provided the request conforms to the requirements of § 385.2001 of this chapter; and

**(7)** Take whatever steps are necessary to ensure the protection of all environmental resources during the construction or operation of natural gas facilities, including authority to design and implement additional or alternative measures and stop work authority.

**(y)** Take appropriate action on the following:

**(1)** Any action incidental to the exercise of delegated authority, including waiver of notice as provided in section 4(d) of the Natural Gas Act, provided the request conforms to the requirements of § 385.2001 of this chapter; and

**(2)** Requests or petitions for waivers of filing requirements for statements and reports under §§ 260.8 and 260.9 of this chapter.

**(z)** Approve, on a case-specific basis, and make such decisions and issue guidance as may be necessary in connection with the use of the pre-filing procedures in § 157.21, " Pre-filing procedures and review process for LNG terminal facilities and other natural gas facilities prior to filing of applications."

**(aa)** Take the following actions to implement part 5 of this chapter on or after October 23, 2003:

**(1)** Act on requests for approval to use the application procedures of parts 4 or 16, pursuant to § 5.3 of this chapter;

**(2)** Approve a potential license applicant's proposed study plan with appropriate modifications pursuant to § 5.13 of this chapter;

**(3)** Resolve formal study disputes pursuant to § 5.14 of this chapter; and

**(4)** Resolve disagreements brought pursuant to § 5.15 of this chapter.

**(bb)** Establish a schedule for each Federal agency or officer, or State agency or officer acting pursuant to delegated Federal authority, to issue or deny Federal authorizations required for natural gas projects subject to section 3 or 7 of the Natural Gas Act.

[Order 492, 53 FR 16065, May 5, 1988]

## 18 C.F.R. § 385.716 Reopening

**(a) General rule.** To the extent permitted by law, the presiding officer or the Commission may, for good cause under paragraph (c) of this section, reopen the evidentiary record in a proceeding for the purpose of taking additional evidence.

**(b) By motion.**

   **(1)** Any participant may file a motion to reopen the record.

   **(2)** Any motion to reopen must set forth clearly the facts sought to be proven and the reasons claimed to constitute grounds for reopening.

   **(3)** A participant who does not file an answer to any motion to reopen will be deemed to have waived any objection to the motion provided that no other participant has raised the same objection.

**(c) By action of the presiding officer or the Commission.** If the presiding officer or the Commission, as appropriate, has reason to believe that reopening of a proceeding is warranted by any changes in conditions of fact or of law or by the public interest, the record in the proceeding may be reopened by the presiding officer before the initial or revised initial decision is served or by the Commission after the initial decision or, if appropriate, the revised initial decision is served.

[Order 225, 47 FR 19022, May 3, 1982, as amended by Order 375, 49 FR 21316, May 21, 1984]

## 40 C.F.R. § 1502.9 Draft, final, and supplemental statements.

**(a) Generally.** Except for proposals for legislation as provided in § 1506.8 of this chapter, agencies shall prepare environmental impact statements in two stages and, where necessary, supplement them, as provided in paragraph (d)(1) of this section.

**(b) Draft environmental impact statements.** Agencies shall prepare draft environmental impact statements in accordance with the scope decided upon in the scoping process (§ 1501.9 of this chapter). The lead agency shall work with the cooperating agencies and shall obtain comments as required in part 1503 of this chapter. To the fullest extent practicable, the draft statement must meet the requirements established for final statements in section 102(2)(C) of NEPA as interpreted in the regulations in this subchapter. If a draft statement is so inadequate as to preclude meaningful analysis, the agency shall prepare and publish a supplemental draft of the appropriate portion. At appropriate points in the draft statement, the agency shall discuss all major points of view on the environmental impacts of the alternatives including the proposed action.

**(c) Final environmental impact statements.** Final environmental impact statements shall address comments as required in part 1503 of this chapter. At appropriate points in the final statement, the agency shall discuss any responsible opposing view that was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised.

**(d) Supplemental environmental impact statements.** Agencies:

**(1)** Shall prepare supplements to either draft or final environmental impact statements if a major Federal action remains to occur, and:

**(i)** The agency makes substantial changes to the proposed action that are relevant to environmental concerns; or

**(ii)** There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

**(2)** May also prepare supplements when the agency determines that the purposes of the Act will be furthered by doing so.

**(3)** Shall prepare, publish, and file a supplement to a statement (exclusive of scoping (§ 1501.9 of this chapter)) as a draft and final statement, as is appropriate to the stage of the statement involved, unless the Council approves alternative procedures (§ 1506.12 of this chapter).

**(4)** May find that changes to the proposed action or new circumstances or information relevant to environmental concerns are not significant and therefore do not require a supplement. The agency should document the finding consistent with its agency NEPA procedures (§ 1507.3 of this chapter), or, if necessary, in a finding of no significant impact supported by an environmental assessment.

## 49 C.F.R. § 192.163 Compressor stations: Design and construction.

**(a) Location of compressor building.** Except for a compressor building on a platform located offshore or in inland navigable waters, each main compressor building of a compressor station must be located on property under the control of the operator. It must be far enough away from adjacent property, not under control of the operator, to minimize the possibility of fire being communicated to the compressor building from structures on adjacent property. There must be enough open space around the main compressor building to allow the free movement of fire-fighting equipment.

**(b) Building construction.** Each building on a compressor station site must be made of noncombustible materials if it contains either -

   **(1)** Pipe more than 2 inches (51 millimeters) in diameter that is carrying gas under pressure; or

   **(2)** Gas handling equipment other than gas utilization equipment used for domestic purposes.

**(c) Exits.** Each operating floor of a main compressor building must have at least two separated and unobstructed exits located so as to provide a convenient possibility of escape and an unobstructed passage to a place of safety. Each door latch on an exit must be of a type which can be readily opened from the inside without a key. Each swinging door located in an exterior wall must be mounted to swing outward.

**(d) Fenced areas.** Each fence around a compressor station must have at least two gates located so as to provide a convenient opportunity for escape to a place of safety, or have other facilities affording a similarly convenient exit from the area. Each gate located within 200 feet (61 meters) of any compressor plant building must open outward and, when occupied, must be openable from the inside without a key.

**(e) Electrical facilities.** Electrical equipment and wiring installed in compressor stations must conform to the NFPA-70, so far as that code is applicable.

[35 FR 13257, Aug. 19, 1970, as amended by Amdt. 192-27, 41 FR 34605, Aug. 16, 1976; Amdt. 192-37, 46 FR 10159, Feb. 2, 1981; 58 FR 14521, Mar. 18, 1993; Amdt. 192-85, 63 FR 37502, 37503, July 13, 1998; Amdt. 192-119, 80 FR 181, Jan. 5, 2015]